1   Mark D. Petersen (State Bar No. 111956)
    Frank J. Riebli (State Bar No. 221152)
2   Farella Braun & Martel LLP
    235 Montgomery Street, 17th Floor
3   San Francisco, CA 94104
    Telephone: (415) 954-4400
4   Facsimile: (415) 954-4480
    mpetersen@fbm.com
5   friebli@fbm.com

6   Attorneys for Defendants
    VCH SALINAS I LLC, NORM YOP, INC.
7   REALTORS, and MONICA FARANDA

8                   UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                          SAN JOSE DIVISION

11

12  BEATRICE GONZALEZ AND JOSE            Case No. C 07-05698 JW
    URTIZ, JORGE AGUIRRE, ELEAZAR
13  BECERRA AND ROCIO BECERRA, J.
    GUADALUPE CONTRERAS AND
14  TERESA CONTRERAS, all individually and   **APPENDIX OF CASES CITED IN
    on behalf of the general public,         PLAINTIFFS' OPPOSITION BY
15                                           DOCKET NUMBER ONLY**
              Plaintiffs,
16                                           Date:     March 24, 2008
         vs.                                 Time:     9:00 a.m.
17                                           Dept.:    Courtroom 8, 4th Floor
    VCH SALINAS I LLC dba VALLEY             Judge:    Honorable James Ware
18  COMMUNITY HOMES and as MONTE
    BELLA REALTY, NORM YOP INC.              Trial Date: Not Set
19  REALTORS dba MONTE BELLA REALTY,
    MONICA FARANDA dba as MONTE
20  BELLA REALTY, UNIVERSAL
    MORTGAGE & SALES INC., IRA
21  MORTGAGE & HOME SALES, INC.,
    AMERICAN PACIFIC MORTGAGE CORP.
22  dba as CREATIVE MORTGAGE, OLD
    REPUBLIC TITLE CO., COUNTRYWIDE
23  FINANCIAL CORP. dba AMERICA'S
    WHOLESALE LENDER, NEW CENTURY
24  MORTGAGE CORP., CAMERON
    FINANCIAL GROUP INC., WELLS
25  FARGO BANK, and DOES 1 TO 100,
    inclusive,
26
              Defendants.
27

28

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

APPENDIX OF CASES CITED IN PLAINTIFFS'
OPPOSITION BY DOCKET NUMBER ONLY
Case No. C 07-05698 JW

22757\1404605.1

Appendix of Cases Cited
in Plaintiffs' Opposition
by Docket Number Only

Westlaw.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 1

**C**
Beard v. Worldwide Mortgage Corp.
W.D.Tenn.,2005.

United States District Court,W.D. Tennessee,Western Division.
Charlesetta BEARD, Plaintiff,
v.
WORLDWIDE MORTGAGE CORPORATION, et al., Defendants.
**No. 04-2183-D/An.**

Feb. 3, 2005.

**Background:** Borrower brought action alleging that settlement agent and its owner notary, in conjunction with the remaining defendants, engaged in conduct which constituted predatory lending practices and a predatory lending scheme in violation of Racketeer Influenced and Corrupt Organizations Act (RICO), the Fair Housing Act (FHA), the Truth-in-Lending Act (TILA), the Real Estate Settlement Procedures Act (RESPA), and other state and federal laws. Settlement agent filed motion to dismiss.

**Holdings:** The District Court, Donald, J., held that:

(1) RICO predicate offenses of mail fraud and/or wire fraud were sufficiently alleged to satisfy the particularity requirements of rule governing pleading of fraud;

(2) borrower sufficiently alleged an association-in-fact enterprise under RICO;

(3) FHA anti-discrimination provision was broad enough to encompass home improvement loans and refinancing loans;

(4) settlement agent was not a "creditor" within meaning of Equal Credit Opportunity Act (ECOA) or TILA;

(5) no private right of action existed for violations of RESPA; and

(6) complaint stated conspiracy claim under Tennessee law.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A ⟐636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Claims for mail and wire fraud must meet requirements for pleading fraud with particularity. 18 U.S.C.A. §§ 1341, 1343; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⟐636**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases

**Fraud 184 ⟐45**

184 Fraud
    184II Actions
        184II(C) Pleading
            184k45 k. Falsity of Representations and Knowledge Thereof. Most Cited Cases
Allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

were knowingly made. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☜636**

170A Federal Civil Procedure
  170AVII Pleadings and Motions
    170AVII(A) Pleadings in General
      170Ak633  Certainty,  Definiteness  and Particularity
        170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
An exception to the particularity requirement for pleading fraud exists when the relevant facts lie exclusively within the knowledge and control of the opposing party; in such a case, pleading upon information and belief is permissible, although the plaintiff must still plead a statement of facts upon which the belief is based. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[4] Postal Service 306 ☜35(2)**

306 Postal Service
  306III Offenses Against Postal Laws
    306k35 Use of Mails to Defraud
      306k35(2) k. Nature and Elements of Offense in General. Most Cited Cases

**Telecommunications 372 ☜1014(2)**

372 Telecommunications
  372III Telephones
    372III(I) Offenses and Prosecutions
      372k1011 Offenses
        372k1014 Wire Fraud
          372k1014(2)  k.  Nature  and  Elements of Offense in General. Most Cited Cases
      (Formerly 372k362)
Elements of mail and wire fraud are: 1) a scheme to defraud, and 2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme. 18 U.S.C.A. §§ 1341, 1343.

**[5] Federal Civil Procedure 170A ☜636**

170A Federal Civil Procedure

170AVII Pleadings and Motions
  170AVII(A) Pleadings in General
    170Ak633  Certainty,  Definiteness  and Particularity
      170Ak636 k. Fraud, Mistake and Condition of Mind. Most Cited Cases
Racketeer Influenced and Corrupt Organizations Act (RICO) predicate offenses of mail fraud and/or wire fraud were sufficiently alleged to satisfy the particularity requirements of rule governing pleading of fraud; borrower alleged that lender, settlement agent and its owner engaged in a pattern of false representations, some oral and some in writing, to induce consumers to enter into home refinance transactions, to obtain loan approval, and to make the loans more marketable in the secondary mortgage market by making it falsely appear that the values of properties were substantially greater than the principal indebtedness on the loans, the complaint indicated the parties to the alleged fraudulent scheme and the specific dates that certain alleged misrepresentations occurred, borrower sufficiently alleged that she relied on defendants' purported misrepresentations because she made the loan payments, including paying fees to the defendants which were not indicated on the HUD-1 statement, and complaint sufficiently alleged the use of the mail or interstate electronic communications in the furtherance of the predatory lending scheme. 18 U.S.C.A. §§ 1341, 1343, 1962(c); Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[6] Postal Service 306 ☜35(8)**

306 Postal Service
  306III Offenses Against Postal Laws
    306k35 Use of Mails to Defraud
      306k35(8)  k.  Effectiveness  of  Matter Mailed to Further Fraud. Most Cited Cases

**Telecommunications 372 ☜1014(2)**

372 Telecommunications
  372III Telephones
    372III(I) Offenses and Prosecutions
      372k1011 Offenses

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 3

372k1014 Wire Fraud
372k1014(2) k. Nature and Elements of Offense in General. Most Cited Cases
(Formerly 372k362)
Element of a claim for mail or wire fraud-the use of the mails or an interstate electronic communication to further the fraudulent scheme-does not require personal use; however, a complaint alleging mail fraud or wire fraud must, at a minimum, allege that a mailing or an interstate electronic communication occurred. 18 U.S.C.A. §§ 1341, 1343.

**[7] Racketeer Influenced and Corrupt Organizations 319H ☞35**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk33 Enterprise
319Hk35 k. What Constitutes Enterprise in General. Most Cited Cases
A Racketeer Influenced and Corrupt Organizations Act (RICO) "enterprise" is a group of persons associated together for a common purpose of engaging in a course of conduct. 18 U.S.C.A. § 1961(4).

**[8] Racketeer Influenced and Corrupt Organizations 319H ☞36**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk33 Enterprise
319Hk36 k. Informal Entities; Associations-In-Fact. Most Cited Cases
Racketeer Influenced and Corrupt Organizations Act (RICO) plaintiffs may establish the existence of an enterprise by showing an "association-in-fact enterprise," which may be established by demonstrating (1) that the associated persons formed an ongoing organization, formal or informal, (2) that they functioned as a continuing unit, and (3) that the organization was separate from the pattern of racketeering activity in which it engaged. 18 U.S.C.A. §

1961(4).

**[9] Racketeer Influenced and Corrupt Organizations 319H ☞35**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk33 Enterprise
319Hk35 k. What Constitutes Enterprise in General. Most Cited Cases
Simply conspiring to commit a fraud is not enough to establish a Racketeer Influenced and Corrupt Organizations Act (RICO) enterprise if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes. 18 U.S.C.A. § 1961(4).

**[10] Racketeer Influenced and Corrupt Organizations 319H ☞28**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(A) In General
319Hk24 Pattern of Activity
319Hk28 k. Continuity or Relatedness; Ongoing Activity. Most Cited Cases
For purposes of Racketeer Influenced and Corrupt Organizations Act (RICO), a pattern of racketeering activity is established by showing (1) a relationship between predicate acts, and (2) the threat of continuity; predicate acts are related if they have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events, and plaintiffs can either demonstrate a closed-ended or an open-ended pattern to establish continuity. 18 U.S.C.A. § 1961(5).

**[11] Racketeer Influenced and Corrupt Organizations 319H ☞43**

319H Racketeer Influenced and Corrupt Organizations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 4

319HI Federal Regulation
   319HI(A) In General
      319Hk33 Enterprise
         319Hk43 k. Banks or Other Financial
Institutions. Most Cited Cases
Borrower, who alleged predicate offenses of mail
and wire fraud in connection with a predatory lend-
ing scheme, sufficiently alleged an association-
in-fact enterprise under Racketeer Influenced and
Corrupt Organizations Act (RICO) of which settle-
ment agent and its owner, who provided services in
connection with the refinancing of borrower's exist-
ing mortgage, were members; complaint allowed an
inference that the alleged enterprise had a sufficient
structure to enable it to function independently of
its predicate acts, allegations established that the
behavior of settlement agent and its owner was co-
ordinated in such a way that they functioned with at
least some of the other defendants as a continuing
unit, and that a scheme and racketeering activity
occurred from 2001 through 2004. 18 U.S.C.A. §§
1961(4), 1962(c).

**[12] Civil Rights 78 ☞1079**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1074 Housing
         78k1079 k. Loans and Financing. Most
Cited Cases
Fair Housing Act (FHA) anti-discrimination provi-
sion was broad enough to encompass home im-
provement loans and refinancing loans. Civil Rights
Act of 1968, § 804(b), 42 U.S.C.A. § 3604(b).

**[13] Civil Rights 78 ☞1076**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1074 Housing
         78k1076 k. Sale; Vendor and Purchaser.
Most Cited Cases

**Civil Rights 78 ☞1079**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1074 Housing
         78k1079 k. Loans and Financing. Most
Cited Cases
In order to be liable under Fair Housing Act (FHA)
section prohibiting discrimination in residential real
estate-related transactions, the entity or person
making the loan must be engaged in the business of
residential real estate transactions; business of res-
idential real estate transactions includes (1) making
loans, (2) purchasing loans, (3) providing financial
assistance, (4) selling residential real property, (5)
brokering residential real property, or (6) apprais-
ing residential real property. Civil Rights Act of
1968, § 805, 42 U.S.C.A. § 3605.

**[14] Civil Rights 78 ☞1079**

78 Civil Rights
   78I Rights Protected and Discrimination Prohib-
ited in General
      78k1074 Housing
         78k1079 k. Loans and Financing. Most
Cited Cases
Settlement agent, which provided services in con-
nection with the refinancing of borrower's existing
mortgage, could not be held liable for violation of
Fair Housing Act (FHA) section prohibiting dis-
crimination in residential real estate-related transac-
tions, absent proof that settlement agent was en-
gaged in the business of residential real estate
transactions. Civil Rights Act of 1968, § 805, 42
U.S.C.A. § 3605.

**[15] Consumer Credit 92B ☞33.1**

92B Consumer Credit
   92BII Federal Regulation
      92BII(A) In General
         92Bk33 Persons, Businesses, and Trans-
actions Subject to Regulations
            92Bk33.1 k. In General. Most Cited
Cases
Settlement agent, which provided services in con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

nection with the refinancing of borrower's existing mortgage, was not a "creditor" within meaning of Equal Credit Opportunity Act (ECOA) or Truth-in-Lending Act (TILA); there was no allegation that settlement agent extended consumer credit or that it regularly did so, and complaint did not assert that agent was an entity granting members the ability to defer payment of a debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor. Truth in Lending Act, §§ 103(f), 702(d), as amended, 15 U.S.C.A. §§ 1602(f), 1691a(d).

**[16] Action 13 ⬅⇒3**

13 Action
    13I Grounds and Conditions Precedent
        13k3 k. Statutory Rights of Action. Most Cited Cases
No private right of action existed for violations of Real Estate Settlement Procedures Act (RESPA). Real Estate Settlement Procedures Act of 1974, § 5(c), 12 U.S.C.A. § 2604(c).

**[17] Fraud 184 ⬅⇒3**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k2 Elements of Actual Fraud
            184k3 k. In General. Most Cited Cases
Under Tennessee law, to establish a claim for fraud, the plaintiff must show: (1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the representation's falsity, (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and (4) that the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must embody a promise of future action without the present intention to carry out the promise.

**[18] Mortgages 266 ⬅⇒217**

266 Mortgages

    266IV Rights and Liabilities of Parties
        266k215 Actions for Damages
            266k217 k. Against Third Persons. Most Cited Cases
Borrower sufficiently alleged a claim for fraud under Tennessee law against settlement agent, which provided services in connection with the refinancing of borrower's existing mortgage; complaint alleged that agent prepared a fraudulent settlement statement and other documents, and, as a result, borrower was not advised or aware of various fees and costs associated with the mortgage loan, that agent had knowledge that the documents and other representations were false, and that borrower relied on the documents prepared by agent, which resulted in her entering into a mortgage agreement that was to her detriment in that it deprived her of money or property. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[19] Trover and Conversion 389 ⬅⇒1**

389 Trover and Conversion
    389I Acts Constituting Conversion and Liability Therefor
        389k1 k. Nature and Elements of Conversion in General. Most Cited Cases
To establish a claim for conversion under Tennessee law, a plaintiff must show that the defendant has (1) appropriated something belonging to the plaintiff to its own use and benefit, (2) by the exercise of dominion over it, (3) in defiance of the plaintiff's right.

**[20] Mortgages 266 ⬅⇒217**

266 Mortgages
    266IV Rights and Liabilities of Parties
        266k215 Actions for Damages
            266k217 k. Against Third Persons. Most Cited Cases
Borrower sufficiently alleged conversion claim under Tennessee law against settlement agent, which provided services in connection with the refinancing of borrower's existing mortgage; complaint alleged that settlement agent appropriated, by taking

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

undisclosed, unreported or unreasonable fees, and/ or loan proceeds belonging to borrower for its own use.

**[21] Fraud 184 ☜13(3)**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(3) k. Statements Recklessly Made; Negligent Misrepresentation. Most Cited Cases

**Fraud 184 ☜29**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k29 k. Persons Entitled to Sue. Most Cited Cases
Even when there is no contractual privity between the plaintiff and the defendant, plaintiff can recover under Tennessee law for negligent misrepresentation by establishing that:(1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; (2) the defendant supplies faulty information meant to guide others in their business transactions; (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relies upon the information. Restatement (Second) of Torts § 552.

**[22] Deposits and Escrows 122A ☜13**

122A Deposits and Escrows
    122AII Conditional Deposits or Escrows
        122Ak13 k. Depositaries. Most Cited Cases
Allegations in borrower's complaint against settlement agent, which had provided services in connection with the refinancing of borrower's existing mortgage, were sufficient to state a claim for negligent misrepresentation under Tennessee law; com-

plaint alleged that, to obtain the mortgage loan, borrower relied on the fraudulent settlement statement and other documents prepared by agent, and that those documents were replete with omissions and/ or misrepresentations.

**[23] Principal and Agent 308 ☜48**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k48 k. Nature of Agent's Obligation. Most Cited Cases
In Tennessee, an agent is a fiduciary with respect to the matters within the scope of his agency.

**[24] Principal and Agent 308 ☜79(4)**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k79 Actions for Negligence or Wrongful Acts of Agent
                308k79(4) k. Pleading. Most Cited Cases
Complaint alleged sufficient facts to infer the existence of a fiduciary relationship between borrower and settlement agent, which provided services in connection with the refinancing of borrower's existing mortgage; settlement agent served as the closing agent for the loan transaction and that the loan disbursement statement showed that settlement agent was paid attorney fees.

**[25] Contracts 95 ☜326**

95 Contracts
    95VI Actions for Breach
        95k326 k. Grounds of Action. Most Cited Cases
Under Tennessee law, a plaintiff alleging breach of contract must plead sufficient facts to establish (1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach.

**[26] Antitrust and Trade Regulation 29T ☜ 148**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 7

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(A) In General
         29Tk139 Persons and Transactions Covered Under General Statutes
            29Tk148 k. Tortious Conduct and Negligence in General. Most Cited Cases
         (Formerly 92Hk4 Consumer Protection)
To assert a claim pursuant to Tennessee Consumer Protection Act (TCPA), plaintiff must establish that the defendant engaged in tortious conduct and that the plaintiff was exposed/subject to the tortious conduct. West's T.C.A. § 47-18-109(a).

**[27] Antitrust and Trade Regulation 29T ☞ 358**

29T Antitrust and Trade Regulation
   29TIII Statutory Unfair Trade Practices and Consumer Protection
      29TIII(E) Enforcement and Remedies
         29TIII(E)5 Actions
            29Tk356 Pleading
               29Tk358 k. Particular Cases. Most Cited Cases
         (Formerly 92Hk38 Consumer Protection)
Borrower sufficiently pled a claim against settlement agent, which provided services in connection with the refinancing of borrower's existing mortgage, for violation of Tennessee Consumer Protection Act (TCPA) where she adequately pled claims for fraud, negligent misrepresentation, and breach of fiduciary duty. West's T.C.A. § 47-18-109(a).

**[28] Principal and Agent 308 ☞ 79(1)**

308 Principal and Agent
   308II Mutual Rights, Duties, and Liabilities
      308II(A) Execution of Agency
         308k79 Actions for Negligence or Wrongful Acts of Agent
            308k79(1) k. Rights of Action and Defenses. Most Cited Cases
Absent a contractual relationship, borrower could not raise "unconscionability" claim under Tenness-

ee law against settlement agent, which provided services in connection with the refinancing of borrower's existing mortgage. West's T.C.A. § 47-2-302.

**[29] Conspiracy 91 ☞ 9**

91 Conspiracy
   91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
         91k9 k. Conspiracy to Defraud. Most Cited Cases
Under Tennessee law, to prove a conspiracy to defraud, the plaintiff must establish a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has the purpose; the agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.

**[30] Conspiracy 91 ☞ 13**

91 Conspiracy
   91I Civil Liability
      91I(A) Acts Constituting Conspiracy and Liability Therefor
         91k12 Persons Liable
            91k13 k. In General. Most Cited Cases
Under Tennessee law, each conspirator is liable for all damages caused by the actions of any of his coconspirators in carrying out their common design.

**[31] Conspiracy 91 ☞ 18**

91 Conspiracy
   91I Civil Liability
      91I(B) Actions
         91k18 k. Pleading. Most Cited Cases
Allegations in borrower's complaint against settlement agent, which provided services in connection with the refinancing of borrower's existing mort-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 8

gage, were sufficient to state conspiracy claim under Tennessee law; borrower alleged that settlement agent committed an overt act in furtherance of a predatory lending scheme by preparing and notarizing fraudulent closing documents, and that agent fraudulently attempted, and did in fact, obtain money belonging to borrower.

**\*794** Margaret R. Barr-Myers, Esq., Webb A. Brewer, Esq., Sapna V. Raj, Susan L. Ratner, Memphis Area Legal Services, Inc., Memphis, TN, for Plaintiff.
John S. Golwen, Esq., Ashley Swain Old, Husch & Eppenberger, LLC, Memphis, TN, for Defendants.
S. Thomas Anderson, Jackson, TN, pro se.

**ORDER GRANTING IN PART AND DENYING IN PART THE MOTION OF EQUITY TITLE AND ESCROW CO. OF MEMPHIS, LLC, AND STEVEN WINKEL TO DISMISS; AND GRANTING PLAINTIFF LEAVE TO AMEND THE COMPLAINT**

DONALD, District Judge.

Before the Court is the motion of Equity Title and Escrow Company of Memphis, LLC ("Equity Title") and Steven Winkel ("Winkel") (collectively "Defendants") to dismiss the complaint of Charlesetta Beard ("Plaintiff") pursuant to Fed.R.Civ.P. 12(b)(6). Plaintiff asserts that Defendants violated 1) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq.; 2) the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, et seq.; 3) the Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601, et seq.; 4) the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, et seq.; 5) the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et seq.; and 6) the Tennessee Consumer Protection Act ("TCPA"), Tenn.Code Ann. § 47-18-101, et seq. Plaintiff additionally asserts state law claims for fraud, conversion, negligent misrepresentation, breach of fiduciary duty, breach of contract, conspiracy, and unconscionability. Defendants contend that the complaint should be dismissed because Plaintiff failed to sufficiently plead claims for violations of RICO,

fraud, and conspiracy, and otherwise failed to state a claim upon which relief may be granted. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. For the following reasons, the Court grants in part and denies in part Defendants' motion to dismiss.

## I. FACTUAL ALLEGATIONS

Plaintiff, an African-American woman, asserts that Equity Title and Winkel, in conjunction with the remaining defendants in this case, engaged in conduct which constituted predatory lending practices and a predatory lending scheme. Plaintiff contends that all of the defendants acted in concert to lure unsuspecting and unsophisticated African-American homeowners into exploitative mortgage loans to purportedly consolidate debt and/or finance home repairs or home improvement work.[FN1]

> FN1. As previously noted, Plaintiff's complaint includes claims for violations of RICO and for conspiracy. Accordingly, the factual allegations made in the complaint concerning all the defendants must be examined in order to analyze Defendants' arguments in support of their motion to dismiss.

In support of her claims, Plaintiff asserts, *inter alia,* that she bought a house in August 1993 for $73,900. Compl. ¶ 21. Plaintiff paid a down payment of approximately $30,000 for the house, with a remaining balance on the mortgage of $44,500. *Id.* Plaintiff remained current on her mortgage payments until March 2003. *Id.* ¶ 22.

In or about December 2002, Plaintiff heard an advertisement on radio station **\*795** WBBP, 1480 AM, from Worldwide Mortgage Corporation ("Worldwide") claiming that individuals could get "easy money," have "cash in [their] pocket [s] for Christmas," consolidate bills, and have home improvement work done on their homes. *Id.* ¶ 23. At that time, Plaintiff was in arrears two payments on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

her car loan. *Id.* ¶ 24. After hearing the advertisement, Plaintiff contacted Worldwide in order to get a loan to help her catch up with her car payments. *Id.* ¶ 25.

When Plaintiff called Worldwide, the woman who answered the telephone asked Plaintiff for her social security number and verified employment information. *Id.* ¶ 27. In or about January 2003, Worldwide informed Plaintiff that she had been "approved for a loan," and Plaintiff was given an appointment to meet with someone at Worldwide. *Id.* ¶ 29. When Plaintiff went to the appointment, Worldwide did not tell Plaintiff the amount of the loan, the interest rate, closing costs, any of the terms of the loan or that the loan was a refinance of her existing mortgage. *Id.* ¶ 30.

Later, Elnora Harris ("Harris") from Worldwide contacted Plaintiff, told her that she could save a lot of money by refinancing, and asked Plaintiff whether she needed any home improvement. *Id.* ¶¶ 32, 34. Plaintiff mentioned that she had considered installing vinyl siding. *Id.* ¶ 34. Plaintiff thought that by "refinancing" her mortgage loan she would, in essence, be serviced by another lender, not that she would have to pay new closing costs, have a new interest rate, pay a higher monthly payment, and have new terms on her loan. *Id.* Harris additionally told Plaintiff that Worldwide offered a product that would permit her to make mortgage payments biweekly, a payment schedule that would reduce the term of her loan to 21 years. Plaintiff, however, only had 20 years left on her mortgage loan. *Id.* ¶ 35. Worldwide conducted the closing on March 18, 2003, at its offices. *Id.* ¶ 41. Plaintiff did not receive a good-faith estimate of closing costs as required by law prior to the closing or at anytime thereafter. *Id.* ¶ 40.

At the closing, four women, including Harris, were in the room with Plaintiff. *Id.* ¶ 42. During the closing, no one mentioned that Plaintiff had a right to cancel,[FN2] and Plaintiff does not believe that she was provided a copy of a Notice of the Right to Cancel as required by federal law. *Id.* ¶ 50. Plaintiff

thinks that she signed the Statement of Non-Cancellation of Right of Rescission at the closing, along with the Notice of Right to Cancel, but it is undated. *Id.* ¶ 51. Additionally, Plaintiff believes that she signed the loan application at the closing, but the one given to her is not dated. *Id.* ¶ 53.

> FN2. Moreover, Worldwide did not inform Plaintiff that she would be charged $500 up-front by Economic Advantages Corporation ("EA") which would handle the biweekly payments, or that, thereafter, she would be charged a servicing fee each time a biweekly payment was made during the term of the loan. Compl. ¶ 36. The $500 fee also does not appear on the HUD-1 Settlement Statement or on any disbursement statements. *Id.* ¶ 37. Worldwide did not tell Plaintiff that although EA collected the payments biweekly, EA only forwarded the payments once a month to PCFS. *Id.* ¶ 38. Furthermore, neither Worldwide nor any other party disclosed to Plaintiff that she was, in fact, making an extra mortgage payment every year or that EA collected interest on the monies paid to them every two weeks. *Id.* ¶¶ 38, 39.

During the closing, Plaintiff asked to meet the attorney who was conducting the closing. Someone told Plaintiff that the attorney could not be there and that the documents that she signed would be couriered to the attorney. *Id.* ¶ 43. Equity Title is listed as the settlement agent for the transaction. To Plaintiff's knowledge, no one from Equity Title participated in or **796** conducted the closing. *Id.* ¶ 44. Likewise, to Plaintiff's knowledge no notary public from Equity Title was present to witness her sign any of the documents at the closing. *Id.* ¶ 45. On March 18, 2003, Winkel notarized the Deed of Trust, which bears Plaintiff's signature; however, Plaintiff has never met Winkel. *Id.* ¶ 47.

Plaintiff believes that $7,800, apparently intended to be used for home improvements to her home, was released immediately to Worldwide, prior to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 10

any work being done on Plaintiff's house.[FN3] *Id.* ¶ 52. The HUD-1 settlement statement, however, dated March 18, 2003, does not show the disbursement of $7,800 to Worldwide.[FN4] *Id.* ¶ 62. The HUD-1 statement further indicates that Plaintiff's existing mortgage with Bank of America in the sum of $39,171.92 was paid off and that Plaintiff received a new loan in the amount of $72,000. *Id.* ¶ 54. Plaintiff's unsecured loans with Arcadia for $6,329, Providian for $2,908, Sears for $440, Capital One for $435, and WFFNB for $225 were consolidated into the new mortgage loan. *Id.* ¶ 59. At the closing, Plaintiff received a stack of checks made out to various creditors and to Plaintiff herself. *Id.* ¶ 70. Plaintiff received three checks totaling $6,651.00; however, the HUD-1 statement shows that she received $15,742.94. *Id.* ¶ 60. The HUD-1 statement also shows that Worldwide received a $3,600 loan origination fee. *Id.* ¶ 61.

> FN3. Plaintiff alleges that on March 19, 2003, the day after the closing, Harris and Ernest Wells, Jr., came to her home to inspect the house for the home improvement work. Compl. ¶ 81. Plaintiff asserted that she only wanted vinyl siding to be installed. *Id.* Apparently, two home improvement contracts, dated March 19, 2003, were drafted at that time. *Id.* ¶ 82. One of the contracts, which lists a total cost of $7,800, relates to putting vinyl siding on Plaintiff's home. *Id.* ¶ 82, Ex. F. The second contract indicates a cost of $11,800. *Id.* ¶ 82.

Worldwide had Plaintiff's house re-sided with vinyl siding. *Id.* at 83. Plaintiff complained to Harris about the color of the installed siding, and Harris had the siding replaced, but it was still the wrong color. *Id.* In or about October 2003, Plaintiff asked Worldwide for a price breakdown, which indicated that she was charged $5,340 for the vinyl siding, $200 for tearing off the "wrong" siding, $600 for reinstalling the wrong color siding again, and $660 in "administrative fees." *Id.* ¶ 84. Plaintiff believes that the price breakdown/work description

was back dated to March 28, 2003, as that is the date that appears on the form. *Id.*

Plaintiff further asserts that she believes that Worldwide, Home Tech Services ("Home Tech"), and Memphis Financial Services, Inc. ("MFS") solicit home repair business and originate loans to finance those repairs. Plaintiff asserts that Worldwide, Home Tech, and MFS are owned and operated by the same persons and are located next door to one another in a shopping center. *Id.* ¶ 86. Plaintiff contends that these entities target African-Americans. *Id.*

> FN4. The closing attorney's disbursement sheet indicates that the "contract amount" of $7,800 that was supposed to be paid to Worldwide, plus $4,000 that also was originally scheduled to be paid to Worldwide, was later paid to Plaintiff. *Id.* ¶ 67. However, Plaintiff received three checks totaling $6,651.00. *Id.* ¶ 60.

Equity Title received a document preparation fee of $195, a settlement fee of $195, an abstract title search fee of $210, notary fees of $10 and courier fees of $40. *Id.* ¶ 65. Additionally, the Loan Disbursement Statement reflects that $390 was paid to Equity Title for attorney fees, although this is not listed on the HUD-1 statement. *Id.* ¶ 66. Plaintiff asserts that the fees paid to Worldwide, EA, and Equity Title were not bona fide or reasonable. *Id.* ¶ 69.

Plaintiff believes that no one from Worldwide actually came to her home for the purpose of appraising it prior to approving Plaintiff for the loan. *Id.* ¶ 28. Likewise, neither Worldwide nor any other defendant provided Plaintiff with a good-*797 faith estimate of closing costs as required by law prior to closing, or at any time thereafter. *Id.* ¶ 40. Moreover, Plaintiff did not understand until March 2004 that she had in fact refinanced her mortgage loan. *Id.* ¶ 26. On March 3, 2004, Plaintiff rescinded the consumer credit loan and "cancelled the home improvement contract" by sending Worldwide, EA, and PCFS notices. *Id.* ¶ 88. On March

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 11

18, 2004, Plaintiff filed the instant action asserting that the defendants' actions constituted predatory lending practices which resulted in violations of federal and state law. Plaintiff seeks monetary and equitable relief from the defendants, including Equity Title and Winkel.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) enables a defendant to file a motion to dismiss for a plaintiff's failure to state a claim upon which relief can be granted. Motions to dismiss under Fed.R.Civ.P. 12(b)(6) are designed to test "whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Dismissal under Fed.R.Civ.P. 12(b)(6) is appropriate when no set of facts exists which would entitle the plaintiff to recover. *Hammond v. Baldwin,* 866 F.2d 172, 175 (6th Cir.1989). Essentially, it allows the court to dismiss meritless cases which would otherwise waste judicial resources and result in unnecessary discovery. *See, e.g., Neitzke v. Williams,* 490 U.S. 319, 326-27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

In reviewing a defendant's Rule 12(b)(6) motion to dismiss, a district court should construe the complaint in the light most favorable to the plaintiff and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Meador v. Cabinet for Human Res.,* 902 F.2d 474, 475 (6th Cir.1990), *cert. denied,*498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1990). If an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1039-40 (6th Cir.1991).

A district court may not grant a defendant's Fed.R.Civ.P. 12(b)(6) motion to dismiss based on its disbelief of the plaintiff's factual allegations. *In Re Sofamor Danek Group, Inc.,* 123 F.3d 394 (6th Cir.1997), *cert. denied, Murphy v. Sofamor Danek*

*Group,* 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998). It is not the court's function to weigh evidence or evaluate the credibility of witnesses. *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir.1995). A court will not consider any disputed questions of fact at this stage. *Barnes v. Winchell,* 105 F.3d 1111, 1114 (6th Cir.1997). Rather, the court should accept all well-pleaded facts as true and not consider matters outside the pleadings. *Hammond,* 866 F.2d at 175.

The United States Supreme Court has held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Neitzke,* 490 U.S. at 326-27, 109 S.Ct. 1827; *Lewis,* 135 F.3d at 405 (6th Cir.1998). Thus, the standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion. *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

## III. ANALYSIS

Defendants assert generally that the claims against them should be dismissed *798 because the complaint fails to allege that Defendants played a role in enticing Plaintiff to refinance her home or that Defendants had any involvement with the repairs which were made to Plaintiff's home. Defendants offer specific arguments to support the dismissal of each claim. The Court therefore will address each claim individually.

## A. *RICO Claims*

Defendants maintain that the Court should dismiss Plaintiff's claims under RICO raised pursuant to 18 U.S.C. § 1962(c) and (d), because the com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789                                                Page 12
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

plaint does not establish a violation of 18 U.S.C. § 1962(c). Title 18, section 1962 of the United States Code provides in pertinent part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c) and (d). To state a claim pursuant to 18 U.S.C. § 1962(c), a plaintiff must establish that 1) the defendants committed two or more predicate offenses; 2) an "enterprise" existed; 3) a connection existed between the pattern of racketeering activity and the enterprise; and 4) the plaintiff suffered an injury to business or property as a result. *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir.2000); *Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc.,* 176 F.3d 315, 322 (6th Cir.1999). Defendants assert that Plaintiff failed to sufficiently plead an 18 U.S.C. § 1962(c) offense.

**1. *Predicate Offenses***

Defendants first argue that Plaintiff has failed to plead with sufficient specificity the acts constituting the predicate offenses. In the complaint, Plaintiff alleges that Defendants violated the predicate offenses defined in 18 U.S.C. §§ 1341 and 1343. Section 1341 defines the criminal offense of mail fraud.[FN5] Section 1343 defines the criminal offense of wire, radio, and television fraud.[FN6]

FN5. Title 18, section 1341 of the United States Code provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341.

FN6. Title 18, section 1343 of the United States Code states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

**\*799** [1][2] The sufficiency of Plaintiff's claims for mail and wire fraud must be examined pursuant to the requirements set forth in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 13

Fed.R.Civ.P. 9(b). *Advocacy Org.,* 176 F.3d at 322. Rule 9(b) requires a plaintiff to plead fraud with particularity. Fed.R.Civ.P. 9(b). The particularity requirement has been interpreted to mean that a plaintiff must allege at a minimum "the time, place, and content of the alleged misrepresentation ...; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 162 (6th Cir.1993). Moreover, "allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Advocacy Org.,* 176 F.3d at 322 (quoting *Coffey,* 2 F.3d at 162).

[3] In ruling upon a motion to dismiss pursuant to Fed.R.Civ.P. 9(b), however, a court must consider the policy of simplicity in pleading found in Fed.R.Civ.P. 8. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988). Rule 8 requires the plaintiff to provide a "short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8. The principal purpose for the Fed.R.Civ.P. 9(b) particularity requirement, when considered in context with Fed.R.Civ.P. 8, is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading. *Michaels Bldg. Co.,* 848 F.2d at 679. Moreover, an exception to the particularity requirement of Fed.R.Civ.P. 9(b) exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party." *Wilkinslex rel. U.S. v. State of Ohio,* 885 F.Supp. 1055, 1061 (S.D.Ohio 1995). In such a case, pleading upon information and belief is permissible, although the plaintiff must still plead a statement of facts upon which the belief is based. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir.1990). A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted. *Michaels Bldg. Co.,* 848 F.2d at 680.

[4][5] The Court will now determine whether the allegations pled by Plaintiff in support of the predicate offenses of mail fraud and/or wire fraud are sufficient to satisfy the particularity requirements of Rule 9(b). "The elements of mail and wire fraud are: 1) a scheme to defraud, and 2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme."*Advocacy Org.,* 176 F.3d at 322. A scheme to defraud

consists of "[i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end." To allege intentional fraud, there must be "proof of misrepresentations or omissions which were 'reasonably calculated to deceive persons of ordinary prudence and comprehension.' " Thus, the plaintiffs must allege with particularity a "false statement of fact made by the defendant which the plaintiff relied on." The plaintiff must also allege "the facts **\*800** showing the plaintiff's reliance on the defendant's false statement of fact." Alternatively, the plaintiff may allege an omission on which he or she relied.

*Kenty v. Bank One, Columbus, N.A.,* 92 F.3d 384, 389-90 (6th Cir.1996) (internal quotations and citations omitted).

Plaintiff asserts *inter alia* that the defendants engaged in the following activities as part of their scheme to defraud her. Worldwide ran an advertisement on the radio in which it claimed it could provide easy money to individuals. *Id.* ¶ 23. In January 2003, Worldwide approved Plaintiff for a loan which refinanced her existing mortgage. That mortgage, which was originally $45,000, had a remaining balance of approximately $40,000 at the time of the transaction. *Id.* ¶¶ 21, 54. Although the amount refinanced totaled approximately $72,000, Plaintiff received three checks totaling $6,651.00. Moreover, contrary to Plaintiff's assertion that she received checks totaling $6,651.00, the HUD-1 statement, prepared by Equity Title, indicates that Plaintiff was supposed to receive $15,742.94. *Id.* ¶

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 14

60. At the March 18, 2003 closing, no one told Plaintiff that she had a right to cancel nor does Plaintiff believe that anyone provided her with a copy of a Notice of the Right to Cancel as required by federal law. *Id.* ¶ 50. Equity Title acted as the settlement agent for the transaction, although Plaintiff is unaware that anyone from Equity Title was actually present at or participated in the closing. *Id.* ¶ 44. On March 18, 2003, Winkel notarized the Deed of Trust, which bears Plaintiff's signature, even though Winkel was not present when Plaintiff signed the document. *Id.* ¶ 47. Plaintiff was told at the closing that the attorney could not be there and that the documents that she signed would be couriered to the attorney. *Id.* ¶ 43.

Equity Title received a document preparation fee of $195, a settlement fee of $195, an abstract title search fee of $210, notary fees of $10 and courier fees of $40, all of which were not bona fide or reasonable fees. *Id.* ¶ 65. Likewise, the Loan Disbursement Statement reflects that Equity Title received $390 for attorney fees, although this is not listed on the HUD-1 statement. *Id.* ¶ 66. Plaintiff further alleges that "Equity Title, acting on behalf of the enterprise, prepared the fraudulent settlement statements and the fraudulent closing documents." *Id.* ¶ 102. Moreover, the complaint asserts that "[t]he fraud in the settlement statements implicates all defendants who received funds, oversaw the closing, and/or prepared the closing documents, including but not limited to MFS, Home Tech, Worldwide, and Equity Title." *Id.* ¶ 103. With respect to Winkel's role in the alleged scheme, the complaint provides that Winkel "is a principal and a part owner of Equity Title...."*Id.* ¶ 11. Finally, Plaintiff generally alleges that "[a]ll Defendants engaged in a pattern of false representations, some oral and some in writing, to induce consumers to enter into these transactions, to obtain loan approval, and to make the loans more marketable in the secondary mortgage market by making it falsely appear that the values of properties are substantially greater than the principal indebtedness on the loan." *Id.* ¶ 105.

These allegations of fraudulent misrepresentations satisfy the first element of a claim for mail or wire fraud-the existence of a scheme to defraud. Specifically, the complaint indicates the parties to the alleged fraudulent scheme and the specific dates that certain alleged misrepresentations occurred. With respect to Equity Title and Winkel, who is alleged to be a principal and part owner of Equity Title, Plaintiff asserts that their preparation of the settlement statements and related documents, in addition to their alleged action or omissions, as the case may be, occurred **\*801** on the closing date of March 18, 2003, or shortly thereafter, as evidenced by Plaintiff's loan approval.

Moreover, the complaint contains sufficient allegations to notify Defendants of the alleged representations they made and how they are alleged to be false or misleading. As noted above, Plaintiff alleges that the settlement statements and related documents were prepared by Equity Title and/or Winkel, as principal and part owner of Equity Title. Thus, the information found in these documents are representations allegedly made by Defendants. As asserted in the complaint, among the alleged representations and omissions in the HUD-1 statement and/or settlement statements that are misleading are 1) the representation in the statement that indicates that the monetary sum of $15,742.94 was supposed to be received by Plaintiff and 2) the omission in the HUD-1 statement of fees and costs allegedly paid to some of the defendants. Based on these allegations, Plaintiff "ha[s] sufficiently alleged a misrepresentation or an omission that was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kenty*, 92 F.3d at 390.

Likewise, the above assertions made by Plaintiff sufficiently allege that Defendants' fraudulent intent was to receive and/or take fees and money to which Defendants were not legally entitled and/or did not legally deserve. Additionally, Plaintiff has sufficiently alleged that she relied on Defendants' purported misrepresentations because she made the loan payments, including paying fees

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
(Cite as: 354 F.Supp.2d 789)

Page 15

to the defendants which were not indicated on the HUD-1 statement. Finally, the assertions discussed *supra* allege Plaintiff's injury, i.e., payment of fees and costs that may not have been owed by, or disclosed to, Plaintiff and/or nonreceipt of moneys that may have been owed to Plaintiff. The Court finds that these allegations establish the first element of mail and wire fraud-a scheme to defraud. Moreover, the Court finds that these allegations serve to satisfy the particularity requirement of Rule 9(b).

Defendants next contend that Plaintiff has failed to assert the predicate acts of mail and wire fraud because the complaint does not sufficiently allege the use of the mail or interstate electronic communications. To establish the second element of mail fraud, i.e., that the defendants used the mails in furtherance of the scheme, Plaintiff alleges that

[a]ll Defendants violated 18 U.S.C. § 1341 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises as contained in the various loan documents including, without limitation, sales contracts, loan applications and HUD-1 Settlement Statements. For the purpose of executing such scheme or artifice or attempting to do so, *all or some of the Defendants used the U.S. mail or private or commercial interstate carriers* in the furtherance of the predatory lending scheme.

*Id.* ¶ 92 (emphasis added). Plaintiff specifically alleges that at the closing she was told that the loan documents would be couriered to the closing attorney. *Id.* ¶ 43. Equity Title received a courier fee of $40. *Id.* ¶ 65.

To establish the second element of wire fraud, i.e., that the defendants used an interstate electronic communication in furtherance of the alleged scheme, Plaintiff asserts that

Defendant Equity Title, acting on behalf of the enterprise, prepared the fraudulent settlement statements and the fraudulent closing documents. De-

fendant Equity Title *used the interstate*\*802 *telephone lines to transfer intentionally and fraudulently altered closing documents on behalf of all defendants* and the enterprise.

*Id.* ¶ 102 (emphasis added).

Defendants' argument is premised in part on the omissions in the complaint that Equity Title used the mail in furtherance of the alleged scheme, or that Winkel specifically used the mail, or an interstate electronic communication, in furtherance of the alleged scheme.

[6] The second element of a claim for mail or wire fraud-the use of the mails or an interstate electronic communication to further the fraudulent scheme-does not require personal use. *United States v. Cantrell,* 278 F.3d 543, 546 (6th Cir.2001); *United States v. Brown,* 147 F.3d 477, 488 (6th Cir.1998); *see also United States v. Oldfield,* 859 F.2d 392, 400 (6th Cir.1988)("Mail fraud only requires that the defendant reasonably anticipate, or as a reasonable person foresee, the use of the mails.") (quoting *United States v. Davidson,* 760 F.2d 97, 99 (6th Cir.1985)); *Echols v. AUSA, et al.,* No. 01-2033, Order on Defs.' Mot. to Dismiss (hereinafter "August 29, 2001 Order"), August 29, 2001 at 19 (W.D.Tenn.2001). A complaint alleging mail fraud or wire fraud must, however, at a minimum allege that a mailing or an interstate electronic communication occurred. *United States v. Srulowitz,* 785 F.2d 382, 386-87 (2d Cir.1986) (noting that because the fact of a mailing is an element of the crime, the government must prove beyond a reasonable doubt that a mailing occurred to convict a defendant for mail fraud). "[L]oose references to mailings and telephone calls in furtherance of a purported scheme to defraud will not do. Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." *Jepson Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir.1994) (internal quotations and citations omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 16

With regard to mail fraud, Plaintiff asserts that all or some of the defendants used the U.S. mail or private or commercial interstate carriers in the furtherance of the predatory lending scheme. Plaintiff further alleges that the scheme could not have succeeded absent mailing the fraudulent loan information among the various defendants. Comp. ¶ 95. More specifically, however, Plaintiff alleges that she was told at the closing that the closing documents would be couriered to the attorney, who was allegedly not in attendance. Moreover, the HUD-1 statement indicates that a courier fee of $40 was assessed to Plaintiff.

With regard to wire fraud, Plaintiff alleges that Equity Title, acting on behalf of the enterprise, prepared the fraudulent settlement statements and the fraudulent closing documents and used the interstate telephone lines to transfer intentionally and fraudulently altered closing documents on behalf of all defendants and the enterprise. Additionally, Plaintiff asserts that Worldwide used the interstate telephone lines to transfer the fraudulently altered loan application. *Id.* ¶ 100.

These allegations indicate that Defendants used mail and interstate electronic communications in furtherance of the alleged scheme to defraud. Moreover, as previously noted, personal use of the mail or interstate electronic communication is not required to state a claim for mail or wire fraud. As such, Defendants' argument that the complaint does not allege that they individually used the mail or electronic communication is unavailing. Moreover, Plaintiff's "failure to indicate the exact date of each of these communications does not mandate dismissal of their mail and wire fraud claims because this information likely would be in the exclusive**803** possession of [D]efendants." *Echols,* No. 01-2033, August 29, 2001 Order at 20. The Court finds that the complaint contains sufficient allegations to satisfy the requirement that the mail and interstate electronic communications were used to further the alleged scheme to defraud. Accordingly, the Court finds that Plaintiff sufficiently al-

leged the predicate offenses of mail fraud and wire fraud.

### 2. *Existence of an Enterprise*

Defendants next argue that Plaintiff's RICO claims should be dismissed because Plaintiff failed to establish the existence of an enterprise. Specifically, Defendant contends that Plaintiff has failed to establish any of the elements of an "association-in-fact enterprise." Defendant asserts that Plaintiff does not allege 1) how Equity Title or Winkel formed a formal or informal organization with the defendants, 2) that Equity Title and Winkel had an ongoing organization in which they continually and consistently provided fraudulent statements, 3) that the enterprise was separate from the pattern of racketeering activity, and 4) the existence of a pattern of racketeering activity.

[7][8] An enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Title 18, section 1961(4) of the United States Code further provides that an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Plaintiffs may establish the existence of an enterprise therefore by showing an "association-in-fact enterprise." To establish an association-in-fact enterprise, the plaintiff must demonstrate "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." *VanDenBroeck,* 210 F.3d at 699.

[9] To satisfy the second element of an association-in-fact enterprise, the "complaint must contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 17

function as a 'continuing unit'...."*Begala v. PNC Bank, Ohio, Nat. Ass'n,* 214 F.3d 776, 781-82 (6th Cir.2000). To establish the third element, a plaintiff must show that the alleged enterprise has "a certain amount of organizational structure" or "some sort of 'chain of command' or other evidence of a hierarchy, even a highly limited one" enabling it to exist apart from the alleged pattern of wrongdoing. *Id.* at 699-700; *see also United States v. Rogers,* 89 F.3d 1326, 1337 (7th Cir.1996) (noting that "[a] RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making") (internal quotations and citations omitted); *Echols,* No. 01-2033, August 29, 2001 Order at 22. However, "simply conspiring to commit a fraud is not enough to trigger the [RICO] Act if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes." *VanDenBroeck,* 210 F.3d at 699; *see also Richmond v. Nationwide Cassel, L.P.,* 52 F.3d 640, 645 (7th Cir.1995) (emphasizing that "[a]n enterprise must be more than a group of people who get together to commit a 'pattern of racketeering activity,' and more than a group of associated businesses that are operated in concert under the control of one family") (internal quotations and citations omitted). Instead, an enterprise must have "a structure***804** and goals separate from the predicate activities themselves." *Richmond,* 52 F.3d at 645 (quoting *United States v. Korando,* 29 F.3d 1114, 1117 (7th Cir.1994)).

[10] In addition, to establish the third element, the plaintiff must establish a pattern of racketeering, which is defined as at least two acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5); *see also Vild v. Visconsi,* 956 F.2d 560, 565 (6th Cir.1992). A pattern of racketeering activity is established by showing 1) a relationship between predicate acts, and 2) the threat of continuity. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Predicate acts are related

if they "have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.,* 492 U.S. at 240, 109 S.Ct. 2893 (internal quotations and citation omitted). To establish continuity, "plaintiffs can either demonstrate a 'closed-ended' or an 'open-ended' pattern; the former consists of 'a closed period of repeated conduct,' whereas the latter refers to 'past conduct that by its nature projects into the future with the threat of repetition.' " *Echols,* No. 01-2033, August 29, 2001 Order at 25 (citing *H.J., Inc.,* 492 U.S. at 241, 109 S.Ct. 2893.). Courts must focus on the predicate racketeering activities, not the events preceding or following those predicate acts. *Vemco v. Camardella,* 23 F.3d 129, 134 (6th Cir.1994) (refusing to consider events that did not qualify as predicate acts and determining that the predicate acts spanned only seventeen months, a time frame insufficient to show the continuity required for a pattern). In cases involving mail or wire fraud, however, the court should look beyond the actual mailings or transmissions, and examine the scope of the fraudulent schemes which the mailings or transmissions furthered. *Echols,* No. 01-2033, August 29, 2001 Order at 26-27 (citing *Tabas v. Tabas,* 47 F.3d 1280, 1294 (3d Cir.1995) (noting that "[a]lthough the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis")).

[11] In the instant case, Plaintiff alleges generally that

[f]rom on or about 2001 through 2004, all Defendants, all of which are persons within the meaning of RICO, were employed by or associated with an enterprise whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); to wit multiple violations of [mail and wire fraud.] The members of the group have the same or similar

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics. These are not isolated events, but represent a pattern of discriminatory and predatory practices.

. . . . .

The associated persons formed an ongoing organization, formal or informal, concerning the RICO enterprise, and the various associates functioned as a continuing unit of the RICO Enterprise, and the RICO enterprise exists separate and apart from the predicate activities themselves. The facts in the case demonstrate the existence of an association-in-fact RICO enterprise by showing that the enterprise has a certain amount of organizational structure or some sort of chain of command.

**\*805** Comp. ¶¶ 91, 97. Plaintiff argues that the facts alleged in the complaint "support the existence of an organizational structure encompassing phases from victim recruitment, qualifying for a loan, brokering the loan and closing the loan, to eventual loan assignment."Pls.' Resp. Opp. Mot. to Dismiss at 12. The Court agrees and finds that Plaintiffs' complaint at least allows an inference that the alleged enterprise has a sufficient structure to enable it to function independently of its predicate acts.

The organizational structure, the coordination of the continuing unit, and pattern of racketeering activity of the association-in-fact enterprise as alleged *inter alia* is summarized as follows. First, Worldwide/MFS/HomeTech induces individuals into signing up for a mortgage by fraudulent misrepresentations and omissions. Compl. ¶ 98. Once the individuals decide to consolidate their debt or have home repairs made, Worldwide directs the borrowers through the financing process. *Id.* EA works in tandem with Worldwide to induce borrowers to enter into contracts whereby the borrowers are not informed of the benefits EA will receive or the obligations that will be imposed on them. *Id.* ¶ 101. On behalf of all the defendants, Worldwide then distributes the fraudulent loan applications and

forged or fraudulently manufactured income or asset verifications through interstate telephone lines. *Id.* ¶ 100. Equity Title and Winkel, a principal and part-owner of Equity Title, prepare the fraudulent settlement statements and fraudulent closing documents. *Id.* ¶¶ 11, 47, 102. All or some of the defendants then use the U.S. mail or private or commercial interstate carriers to send the documents. *Id.* ¶¶ 43, 65, 92. These factual allegations are not isolated events, but represent a pattern of discriminatory and predatory practices by the defendants to ensnare unsophisticated African Americans, which has been ongoing from 2001 through 2004, as evidenced by the defendants' and Equity Title and/or Winkel's alleged actions and commission of predicate offenses in the instant case and in *Johnson v. Home Tech Serv. Co., et al.,* No. 03-2567-Ma/P and *Carr v. Home Tech Serv. Co., Inc., et al.,* No. 03-2569-Ma/P, which are currently pending in the Western District of Tennessee. *Id.* ¶¶ 89, 91.

The Court finds that these allegations are sufficient to establish an inference that Equity Title and Winkel were part of an ongoing informal organization. Likewise, these allegations are sufficient to establish that the behavior of Equity Title and Winkel was coordinated in such a way that they functioned with at least some of the other defendants as a continuing unit.

Finally, these allegations sufficiently establish that Equity Title and Winkel engaged in a pattern of racketeering activity. Despite the fact that this case involves one loan transaction and *Johnson* and *Carr* involve different loan transactions, the overlapping actors in Plaintiff's transaction, as well as the parallels in the ways that some of the defendants, including Equity Title and Winkel, allegedly deceived all of the plaintiffs in these cases provide unity to the loan transactions. Plaintiff alleges activities with the same or similar purposes and results, many of the same participants, and nearly identical methods of commission. When viewed in a light most favorable to Plaintiff, the complaint alleges activities that are "interrelated by distinguishing characterist-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
(Cite as: 354 F.Supp.2d 789)

Page 19

ics and are not isolated events." *H.J., Inc.,* 492 U.S. at 240, 109 S.Ct. 2893; *see also Vild,* 956 F.2d at 566 (noting that the relationship test is not a cumbersome requirement for RICO plaintiffs).

Furthermore, the Court finds that Plaintiff has established continuity sufficient to withstand a motion to dismiss. Plaintiff's complaint alleges a scheme and racketeering*806 activity spanning and occurring from 2001 through 2004, including predicate acts occurring in the instant case from approximately December 2002 through March 2003 and in *Johnson* and *Carr* from approximately January 2002 through July or August 2002. Thus, the relevant time span is roughly fourteen months.

In *Echols,* the court reasoned that
[a]lthough a period of fourteen months without more would be insufficient to demonstrate a closed-ended continuity, *see Vemco,* 23 F.3d at 134 (holding that plaintiff failed to satisfy continuity requirement where he alleged a single fraudulent scheme that lasted seventeen months and involved the construction of a single building contract), plaintiffs allege additional factors not present in *Vemco.* Specifically, the alleged enterprise engaged in a pattern of racketeering activity that targeted three distinct victims and involved three separate real estate transactions. The existence of multiple schemes and victims is relevant to the determination of whether a pattern of racketeering activity exists. *Id.*

*Echols,* August 29, 2001 Order at 27-28. The *Echols* Court went on to note that "most cases involving closed-ended continuity involve predicate acts spanning several years." *Id.* at 28 (citing *United States v. Pelullo,* 964 F.2d 193, 209 (3d Cir.1992); *Metromedia v. Fugazy,* 983 F.2d 350, 369 (2d Cir.1992) (holding that a two year time span was sufficient to allege pattern); *Hindes v. Castle,* 937 F.2d 868, 875 (3d Cir.1991) (collecting cases where racketeering activities ranged from four-and-a-half years to seventeen years); *Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (concluding that predicate acts occurring over an

eight year time span satisfied continuity requirement)). The *Echols* Court further noted that "the dividing line between conduct occurring just over a year and activities occurring over a number of years is somewhat indefinite." *Id.* The court concluded, however, that "defendants' alleged actions over approximately fourteen months involving multiple schemes and targeting multiple victims satisfy the closed-ended continuity requirement." *Id.* This Court agrees with the reasoning and holding of the *Echols* Court concerning the issue of continuity. Given the alleged actions of Equity Title and Winkel, as well as that of other defendants, the Court concludes that the complaint sufficiently alleges continuity. Plaintiff therefore has alleged a pattern of racketeering activity. The Court finds therefore that Plaintiff has alleged an "association-in-fact enterprise." Accordingly, Defendants' motion to dismiss on this basis is denied.

Defendants additionally argue that Plaintiff has not adequately alleged their involvement in the association-in-fact enterprise. More specifically, Equity Title and Winkel contend that Plaintiff's complaint fails to state a RICO claim under 18 U.S.C. § 1962(c) because the complaint contains no indication of how they "conducted" or "participated" in the affairs of the enterprise.

In *Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), the Court addressed the issue of the degree of participation required in a RICO enterprise. The Court held that "in order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at 179, 113 S.Ct. 1163 (quoting 18 U.S.C. § 1962(c)). Specifically, "one must participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. 1163. RICO liability, however, is not limited to those with primary responsibility for the enterprise's affairs. *Id.* at 184, 113 S.Ct. 1163. Indeed,

*807 [a]n enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 20

of upper management. An enterprise also might be "operated" or "managed" by others "associated with" the enterprise who exert control over it as, for example, by bribery.

*Id.* The *Reves* Court concluded that the defendant, an accounting firm which had audited an allegedly fraudulent enterprise and had issued incorrect financial statements based on information provided by the enterprise, had not "participated" sufficiently in the enterprise's affairs to be liable under § 1962(c). *Id.* at 186, 113 S.Ct. 1163.

In *Echols,* the court noted that several courts, when applying *Reves,* have "distinguished between cases involving outsiders, such as the accounting firm in *Reves,* who allegedly participate in an enterprise's affairs by providing advice or services, and cases involving 'association-in-fact' enterprises, where the individuals or entities providing the services constitute the RICO enterprise." *Echols,* No. 01-2033, August 29, 2001 Order at 30 (citing *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 728 n. 3 (7th Cir.1998) (emphasizing that the alleged enterprise was not an association-in-fact and that particular defendants were not alleged to be part of the enterprise but were "best characterized as contractors hired by the enterprise to perform specific tasks"); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.,* 62 F.3d 967, 978-79 (7th Cir.1995) (holding that defendants were " 'lower rung participants who are under the direction of upper management' " and noting that "[t]he primary fact leading us to this conclusion is the nature of the 'enterprise' [plaintiff] has depicted, as both [defendants] are alleged to be members of an 'association-in-fact' constituting the RICO enterprise") (quoting *Reves,* 507 U.S. at 184, 113 S.Ct. 1163); *United States v. Oreto,* 37 F.3d 739, 750 (1st Cir.1994)))). The *Echols* Court elaborated on this distinction, stating that

*Reves* is a case about the liability of outsiders who may assist the enterprise's affairs. Special care is required in translating *Reves'* concern with "horizontal" connections-focusing on the liability

of an outside adviser-into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

*Id.* at 31 (quoting *Oreto,* 37 F.3d at 750ʃ.

The *Echols* Court then considered the facts in that case as compared to those in *Reves. Id.* The allegations in *Echols,* similar to the allegations in the instant action, alleged an association-in-fact enterprise, wherein certain defendants, "acting on behalf of the enterprise of which they were members, committed acts of fraud when they prepared the closing documents and settlement statements." *Id.* The *Echols* Court determined that the defendants' "alleged actions [were] not analogous to outsiders who perform services, albeit with knowledge of illegality, for an enterprise of which they are not members." *Id.* at 31-32. The court concluded that the plaintiff provided sufficient factual allegations from which it could "infer that some of the defendants conducted or participated, either directly or indirectly, in the enterprise's activities." *Id.* at 32.

The Court finds that the holding in *Echols* is applicable to the instant case. Plaintiff alleged an association-in-fact enterprise**808** of which Equity Title and Winkel were members. Like the facts in *Echols,* in the instant case, Equity Title and Winkel, allegedly working on behalf of the enterprise, committed acts of fraud when they prepared the closing documents and settlement statements. The facts alleged in this case are not analogous to those in *Reves* whereby outsiders performed services, albeit with knowledge of illegality, for an enterprise of which they were not members. The Court finds therefore that the complaint provides sufficient allegations from which to infer that Winkel and Equity Title conducted or participated in the enter-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 21

prise's activities.

In sum, the Court finds that the complaint contains sufficient allegations to establish that 1) the defendants committed two or more predicate offenses; 2) an enterprise existed; 3) a connection existed between the pattern of racketeering activity and the enterprise; and 4) the plaintiff suffered an injury to business or property as a result. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's § 1962(c) claim.

Defendants next assert that Plaintiff has not established a violation of 18 U.S.C. § 1962(d). In support of this contention, Defendants rely on Plaintiff's alleged failure to state a claim pursuant 18 U.S.C. § 1962(c). The Court has determined, however, that the complaint sufficiently alleges a claim for violation of 18 U.S.C. § 1962(c). Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's claim for violation of 18 U.S.C. § 1962(d).

## B. *FHA Claims*

Defendants assert that Plaintiff has failed to state a claim against them pursuant to the FHA. Plaintiff asserts claims against Defendants for violations of 42 U.S.C. §§ 3604(b) and 3605. The complaint alleges that

all Defendants were involved in a scheme that intentionally targets African Americans and African American neighborhoods with fraudulent loan practices that are designed to take away their homes.

. . . . .

Specifically, all Defendants have violated the Fair Housing Act by making housing available to African-Americans and subjecting them to discriminatory terms and conditions thereby reducing their ability to use and enjoy housing. Defendants have carried out their discriminatory scheme through a series of predatory practices designed to deprive African Americans of the use, enjoyment, and ultimately ownership of their homes.

Compl. ¶¶ 126, 127.

[12] Title 42, section 3604 of the United State Code provides in pertinent part that it shall be unlawful:

(b) To discriminate against any person in the terms, conditions, or privileges of *sale or rental of a dwelling, or in the provision of services or facilities in connection therewith,* because of race, color, religion, sex, familial status, or national origin.

42 U.S.C. § 3604(b) (emphasis added). Courts have recognized that § 3604(b) of the United States Code prohibits "discrimination in the terms or conditions under which housing is sold or leased." *Maki v. Laakko,* 88 F.3d 361, 365 (6th Cir.1996). "Congress intended § 3604 to reach a broad range of activities that have the effect of denying housing opportunities to a member of a protected class." *Michigan Protection and Advocacy Serv., Inc. v. Babin,* 18 F.3d 337, 344 (6th Cir.1994). Moreover, the phrase "or in the provision of services or facilities" has been broadly construed by courts. *See, e.g.,* **\*809**Campbell v. City of Berwyn, 815 F.Supp. 1138, 1143-44 (N.D.Ill.1993); *see also Dunn v. Midwestern Indem., Mid-American Fire and Cas.,* 472 F.Supp. 1106, 1110 (D.C.Ohio 1979) (noting that the phrase "or in the provision of services or facilities" has been broadly construed to encompass municipal services such as sewage treatment). Thus, the language of § 3604(b) is broad enough to encompass home improvement loans and refinancing loans because the burden of the debt affects individuals ability to buy or sell a dwelling.

In the instant case, Plaintiff refinanced the existing mortgage on her home. Moreover, Equity Title and Winkel are alleged to have provided services in connection with the refinancing of Plaintiff's existing mortgage. The Court finds, therefore, that Plaintiff has asserted a claim against Defendants for violation of § 3604(b). Accordingly, the Court denies Equity Title and Winkel's motion to dismiss Plaintiff's claim pursuant to 42 U.S.C. § 3604(b).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[13] Defendants further assert that Plaintiff's claim for violation of 42 U.S.C. § 3605 should be dismissed. Title 42, section 3605 of the United States Code provides *inter alia* that

[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

(b) "Residential real estate-related transaction" defined

As used in this section, the term "residential real estate-related transaction" means any of the following:

(1) The making or purchasing of loans or providing other financial assistance-

(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

(B) secured by residential real estate.

(2) The selling, brokering, or appraising of residential real property.

42 U.S.C. § 3605. Thus, in order to be liable under § 3605, the entity or person making the loan must be engaged in the business of residential real estate transactions. The business of residential real estate transactions includes 1) making loans, 2) purchasing loans, 3) providing financial assistance, 4) selling residential real property, 5) brokering residential real property, or 6) appraising residential real property.

[14] Plaintiff alleges that Defendants acted as the settlement agent for the loan transaction. Plaintiff does not allege, however, that either Winkel or Equity Title engaged in the business of residential real estate transactions as defined by § 3605. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim against Equity Title and Winkel for violation of 42 U.S.C. § 3605.

### C. *ECOA and TILA Claims*

Equity Title and Winkel argue that Plaintiff's claims against them for violation of 15 U.S.C. § 1691, *et seq.,* of ECOA, and 15 U.S.C. § 1601, *et seq.,* of TILA should be dismissed. Section 1691 of the ECOA provides in pertinent part that

[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction-

(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);

**\*810** (2) because all or part of the applicant's income derives from any public assistance program; or

(3) because the applicant has in good faith exercised any right under this chapter.

15 U.S.C. § 1691(a). The term "creditor" is defined as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of the original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a (e). Regulation B of the ECOA further provides thatCreditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates. For purposes of § 202.4(a) and (b), the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. A person is not a creditor regarding any violation of the Act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction. The term does not include a person whose only participation in a credit transaction involves honoring a credit card.

12 C.F.R. § 202.2(*l* ).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
(Cite as: 354 F.Supp.2d 789)

[15] The complaint alleges that Equity Title and Winkel, as principal and part owner of Equity Title, acted as the settlement agent for the loan at issue. Plaintiff does not allege that either Equity Title or Winkel was the lender or that they regularly participate in credit decisions in the ordinary course of business. Likewise, the complaint does not assert that Equity Title is "an entity granting members the ability 'to defer payment of a debt or to incur debts and defer its payment or to purchase property or services and defer payment therefor....'" *Mays v. Buckeye Rural Elec. Co-op., Inc.,* 277 F.3d 873, 873 (6th Cir.2002) (citing 15 U.S.C. § 1691a(d) and holding that defendant was a creditor under the ECOA based on the definition of credit found in 15 U.S.C. § 1691a(d)). The Court finds that Plaintiff has failed to establish that either Equity Title or Winkel are creditors pursuant to the ECOA. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim against them for violation of 15 U.S.C. § 1691, *et seq.,* without legal prejudice.

Defendants likewise assert that they are not creditors under TILA. The purpose of TILA is

to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601(a). Title 15, section 1640 of the United States Code therefore establishes civil liability when a "creditor" fails to comply with any requirement imposed under TILA. 15 U.S.C. § 1640(a). The term creditor is defined in pertinent part as a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt **811** arising from the consumer credit transaction is initially payable on the face of

the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(f).

As discussed *supra,* Plaintiff alleges that Equity Title and Winkel, as principal and part owner of Equity Title, acted as the settlement agent for the loan at issue. Plaintiff does not allege that Defendants extended consumer credit or that they regularly do so. The Court finds therefore that Plaintiff had failed to allege that Equity Title and Winkel are creditors pursuant to TILA. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim for violation of 15 U.S.C. § 1601, *et seq.,* without legal prejudice.

**D.** *RESPA Claims*

[16] Defendants contend that Plaintiff's claims raised pursuant to 12 U.S.C. §§ 2604(c) and 2607 of RESPA should be dismissed because 1) § 2604(c) does not provide a private damages remedy, and 2) Plaintiff did not allege that the excessive or unearned fees were kicked back or split with a third party. Title 12, section 2604(c) of the United States Code provides that "[e]ach lender shall include ... a good faith estimate of the amount or range of charges for specific settlement services the borrower is likely to incur in connection with the settlement as prescribed by the Secretary." 12 U.S.C. § 2604(c).

The Court of Appeals for the Eleventh Circuit has held that no implied private right of action exists for violations of § 2604(c). *Collins v. FMHA-USDA,* 105 F.3d 1366, 1367-68 (11th Cir.1997). In so ruling, the *Collins* Court reasoned that § 2604(c) replaced the prior § 2605, which explicitly provided for an action for damages for its violations, and that other provisions of RESPA explicitly provide civil remedies. *Id.* at 1368. The court concluded that "there is no private civil action for a violation of 12 U.S.C. § 2604(c), or any regulations relating to it" because no evidence exists to establish that Con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 24

gress intended to create a private right of action, which is one of the prerequisites to finding an implied right of action under *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *Id.* at 1368. Plaintiff does not argue that the holding in *Collins* is incorrect. Moreover, the Court finds that the reasoning in *Collins* is persuasive and, as such, holds that no private right of action exists for violations of § 2604(c). Accordingly, Defendants' motions to dismiss Plaintiff's claim for violation of 12 U.S.C. § 2604(c) is granted.

Defendants next assert that Plaintiff's claim for violation of 12 U.S.C. § 2607(b) should be dismissed. Section 2607(b) provides that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b). Defendants assert that the complaint fails to allege that Equity Title or Winkel "kicked back" or split excessive or unearned fees with a third party. In response to the motion to dismiss, Plaintiff asserts that "Equity Title split the fee for document preparation with Online in spite of the fact that, upon information and belief, Online performed the service." Pl.'s Resp. Opp. Mot. to Dismiss at 26. Although the complaint alleges that Online received a document preparation fee of $45.00, it does not indicate that Equity Title or Winkel split or paid the fee to Online. The Court of Appeals for the Sixth Circuit has accepted the proposition that when "a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district **\*812** court dismisses the action with prejudice." *EEOC v. Ohio Edison Co.,* 7 F.3d 541, 546 (6th Cir.1993) (quoting *Bank v. Pitt,* 928 F.2d 1108, 1112 (11th Cir.1991)). Likewise, a party may seek leave to amend the complaint, and "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Plaintiff asked for leave to amend the complaint should the Court determine that it is necessary. The

Court therefore grants Plaintiff fifteen days to amend the complaint. Accordingly, Defendants' motion to dismiss Plaintiff's claim for violation of 12 U.S.C. § 2607(b) is conditionally denied.

**E. *Fraud***

[17] Defendants assert that Plaintiff's state law claim for fraud should be dismissed because she failed to plead the claim with particularity in accordance with Fed.R.Civ.P. 9(b). Under Tennessee law, to establish a claim for fraud, the plaintiff must show:

(1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the representation['s] falsity-that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity, (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and (4) that the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise."

*Shahrdar v. Global Housing, Inc.,* 983 S.W.2d 230, 237 (Tenn.Ct.App.1998) (quoting *Stacks v. Saunders,* 812 S.W.2d 587, 592 (Tenn.Ct.App.1990)). As discussed *supra* in section A.1., Rule 9(b) requires a plaintiff to plead fraud with particularity. Fed.R.Civ.P. 9(b). The particularity requirement has been interpreted to mean that a plaintiff must allege at a minimum "the time, place, and content of the alleged misrepresentation ...; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey,* 2 F.3d at 162. Moreover, "allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Advocacy Org.,* 176 F.3d at 322 (quoting *Coffey,* 2 F.3d at 162).

In ruling upon a motion to dismiss pursuant to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Fed.R.Civ.P. 9(b), a court must consider the policy of simplicity in pleading embodied in Fed.R.Civ.P. 8. *Michaels Bldg. Co.,* 848 F.2d at 679. Rule 8 requires the plaintiff to provide a "short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8. The principal purpose for the Fed.R.Civ.P. 9(b) particularity requirement, when considered in context with Fed.R.Civ.P. 8, is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading. *Michaels Bldg. Co.,* 848 F.2d at 679. Moreover, an exception to the particularity requirement of Fed.R.Civ.P. 9(b) exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party." *Wilkins ex rel. United States v. State of Ohio,* 885 F.Supp. 1055, 1061 (S.D.Ohio 1995). In such a case, pleading upon information and belief is permissible. The plaintiff, however, must still plead a statement of facts upon which the belief is based. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir.1990). A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted. *Michaels Bldg. Co.,* 848 F.2d at 680.

**\*813** [18] As discussed in section A.1., the complaint asserts in effect that these Defendants prepared a fraudulent settlement statement and other documents; and, as a result, Plaintiff was not advised or aware of various fees and costs associated with the mortgage loan. Moreover, the complaint alleges that Defendants had knowledge that the documents and other representations were false, as evidenced by Winkel's notarization of the Deed of Trust despite his alleged absence from the meeting when Plaintiff signed the document. Finally, Plaintiff alleges that she relied on the documents prepared by Defendants, which resulted in her entering into a mortgage agreement that was to her detriment in that it deprived her of money or property. The Court finds that these allegations are sufficient to satisfy Fed.R.Civ.P. 9(b) in light of

Fed.R.Civ.P. 8. Moreover, the Court finds that Plaintiff has alleged a claim for fraud pursuant to Tennessee law. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's claim for fraud.

**F. *Conversion***

[19][20] Defendants next assert that the complaint fails to state a claim for conversion. To establish a claim for conversion under Tennessee law, a plaintiff must show that the defendant has "1) appropriated something belonging to the plaintiff to its own use and benefit, 2) by the exercise of dominion over it, 3) in defiance of the plaintiff's right." *Mammoth Cave Credit Ass'n v. Oldham,* 569 S.W.2d 833, 836 (Tenn.Ct.App.1977) (internal quotations and citations omitted). The complaint alleges that "each Defendant unlawfully took and/or converted to his/her/its own use certain property of the Plaintiff, to wit: loan proceeds on the subject properties." Compl. ¶ 143. Moreover, the complaint alleges in effect that Equity Title and Winkel appropriated, by taking undisclosed, unreported or unreasonable fees, and/or loan proceeds belonging to Plaintiff for their own use. Given the liberal pleading standards under Rule 8 and the standards under Rule 12(b)(6), the Court finds that the complaint presents sufficient allegations to withstand these Defendants' motion to dismiss Plaintiff's claim for conversion against them.

**G. *Negligent Misrepresentation***

[21][22] Defendants contend that Plaintiff's claim for negligent misrepresentation should be dismissed because Plaintiff failed to identify any representations made by them upon which she relied. Tennessee has adopted the definition of negligent misrepresentation that appears in section 552 of the Restatement (Second) of Torts. *Robinson v. Omer,* 952 S.W.2d 423, 427 (Tenn.1997). Pursuant to this definition, even when there is no contractual privity between the plaintiff and the defendant, the plaintiff

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

can recover by establishing that:

(1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and

(2) the defendant supplies faulty information meant to guide others in their business transactions; and

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and

(4) the plaintiff justifiably relies upon the information.

*Id.* (internal quotations omitted) (emphasis omitted). Plaintiff's complaint alleges that "all Defendants had a duty of due care to the Plaintiff and that the Defendants breached such duty to Plaintiff by omitting or misrepresenting material information to Plaintiff; the negligent misrepresentation of Defendants was the proximate cause of damages suffered by Plaintiffs." Compl. *814 ¶ 144. Defendants argue that Plaintiff failed to identify any representations made by them upon which she justifiably relied. As discussed previously, however, the complaint alleges that, to obtain the mortgage loan, Plaintiff relied on the fraudulent settlement statement and other documents prepared by Equity Title and Winkel, as principal and part owner of Equity Title. The complaint further alleges in sum that these documents were replete with omissions and/or misrepresentations. The Court finds that the allegations in the complaint are sufficient to state a claim for negligent misrepresentation against these Defendants. Accordingly, the Court denies Equity Title and Winkel's motion to dismiss Plaintiff's claim for negligent misrepresentation.

## H. *Breach of Fiduciary Duty*

[23] Defendants assert that Plaintiff has not alleged facts supporting her assertion that a fiduciary relationship existed between herself and Equity Title or Winkel. The complaint alleges that "[a]ll Defendants were agents of the Plaintiff during the

relevant period ... [and] as agents of the Plaintiff, owed fiduciary duties to [her]." Compl. ¶¶ 119, 120. More specifically, Plaintiff alleges that "[a]s agents, Defendants had a fiduciary duty to disclose all material facts relevant to the subject matter of the loan." *Id.* ¶ 121. In Tennessee,

[a]n agent is a fiduciary with respect to the matters within the scope of his agency. The very relationship implies that the principal has reposed some trust or confidence in the agent and the agent or employee is bound to the exercise of the utmost good faith, loyalty, and honesty toward his principal or employer.

*Knox-Tenn Rental Co. v. Jenkins Ins., Inc.,* 755 S.W.2d 33, 36 (Tenn.1988) (citing 3 Am.Jur.2d Agency, § 210, p. 713). Therefore, at a minimum, Plaintiff has alleged an agency relationship existed between herself and Equity Title and Winkel which created a fiduciary duty.

[24] Moreover, Plaintiff alleges that Equity Title served as the closing agent for the loan transaction and that the loan disbursement statement shows that Equity Title was paid attorney fees. "The relationship of attorney and client is 'extremely delicate and fiduciary'; therefore, attorneys must deal with their clients in utmost good faith." *Alexander v. Inman,* 974 S.W.2d 689, 693-94 (Tenn.1998)(internal quotations and citations omitted). The Court finds that the complaint alleges sufficient facts to infer the existence of a fiduciary relationship between Equity Title and Plaintiff. Furthermore, Winkel may be vicariously liable for Equity Title's actions because Plaintiff alleges that Winkel is a principal and part owner of Equity Title. Accordingly, the Court denies Winkel and Equity Title's motion to dismiss Plaintiff's claim for breach of fiduciary duty.

## I. *Breach of Contract*

[25] Defendants assert that Plaintiff has not alleged the existence of a contract between herself and Equity Title or Winkel. Plaintiff alleges that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 27

"all Defendants had contractual relationships with the Plaintiff, either directly or implicitly; Defendants, either directly or through agents, breached such contracts with Plaintiffs; and that the breaching of such contracts by Defendants was the proximate cause of damages suffered by Plaintiff." Compl. ¶ 145. Under Tennessee law, a plaintiff alleging breach of contract must plead sufficient facts to establish "(1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." *Life Care Centers v. Charles Town Assoc.,* 79 F.3d 496, 514 (6th Cir.1996). Despite Plaintiff's allegation, the Court cannot identify the existence of any **\*815** contract between Equity Title or Winkel and Plaintiff. Likewise, the complaint does not indicate how Equity Title or Winkel breached any existing contract. For these reasons, the Court grants Equity Title's and Winkel's motion to dismiss Plaintiff's claim for breach of contract, without legal prejudice.

### J. *TCPA Claim*

[26] Defendants maintain that the Court should dismiss Plaintiff's claim against them for violation of the Tennessee Consumer Protection Act. The TCPA provides for a private cause of action as follows:

Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, ... as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn.Code Ann. § 47-18-109(a). Courts are required to construe the provisions of the TCPA liberally in order "to protect consumers and legitimate business enterprises from those who engage in 'unfair or deceptive acts or practices in the conduct of any trade or commerce.' " *Pursell v. First American Nat'l Bank,* 937 S.W.2d 838, 841 (Tenn.1996) (quoting Tenn.Code Ann. § 47-18-102(2)); *see also Ganzevoort v. Russell,* 949 S.W.2d 293, 296-97 (Tenn.1997); *Morris v. Mack's Used Cars,* 824

S.W.2d 538 (Tenn.1992). To assert a claim pursuant to the TCPA, the plaintiff must establish that the defendant engaged in tortious conduct and that the plaintiff was exposed/subject to the tortious conduct. *See Harvey v. Ford Motor Credit Co.,* 8 S.W.3d 273, 276 (Tenn.Ct.App.1999).

[27] Defendants argue that Plaintiff fails to allege any tortious acts committed by Equity Title or Winkel or that Plaintiff was exposed to that tortious act. Plaintiff alleges that "all Defendants have engaged in fraudulent and/or deceptive business transactions towards Plaintiff and have thereby violated the provisions of the [TCPA] resulting in damages to the plaintiff." Compl. ¶ 140. Moreover, as discussed *supra,* the Court has determined that Plaintiff has sufficiently pled claims for fraud, negligent misrepresentation, and breach of fiduciary duty against Equity Title and Winkel. The Court finds therefore that Plaintiff has sufficiently pled a claim against Defendants for violation of the TCPA. Accordingly, the Court denies Equity Title and Winkel's motion to dismiss Plaintiff's TCPA claim.

### K. *Unconscionability*

[28] Defendants assert that Plaintiff's claim for "unconscionability" should be dismissed. Plaintiff asserts that the Court may act to refuse to enforce contracts or limit application of any unconscionable clause in any contracts pursuant to Tenn.Code Ann. § 47-2-302. Section 47-2-302 provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its com-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 28

mercial setting, purpose and effect to aid the court in making the determination.

Tenn.Code Ann. § 47-2-304.

The Court previously determined that Plaintiff failed to establish a claim for *816 breach of contract against Equity Title or Winkel. Plaintiff therefore cannot assert a claim against, or seek relief from, Equity Title or Winkel pursuant to Tenn.Code Ann. § 47-2-302. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's claim against them for "unconscionability," without legal prejudice.

**L. Conspiracy**

Defendants contend that Plaintiff's claim for conspiracy should be dismissed because Plaintiff does not allege that the primary purpose of Equity Title or Winkel was to injure Plaintiff or that Defendants engaged in an unlawful or tortious act. Defendants further assert that Plaintiff fails to allege a specific overt act in furtherance of conspiracy that is tortious or illegal.

In support of her conspiracy claim, Plaintiff alleges that all of the defendants "agreed by and between each other to engage in a scheme to obtain money from Plaintiff and others similarly situated" and "acted in concert to obtain money from Plaintiff and others ... by engaging in a series of fraudulent transactions." Compl. ¶¶ 111, 112. Plaintiff further alleges that the defendants "intended to accomplish this common purpose and knew of each other's intent to accomplish this purpose." *Id.* ¶ 113. Finally, Plaintiff alleges that the defendants "engaged in one or more overt acts of mail fraud, wire fraud, and fraudulent lending." *Id.* ¶ 114. These allegations indicate that Plaintiff alleges a conspiracy to defraud.

[29][30] Tennessee courts have defined a civil conspiracy as "a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself un-

lawful by unlawful means." *Dale v. Thomas H. Temple Co.,* 186 Tenn. 69, 208 S.W.2d 344, 353 (1948). Under Tennessee law, to prove a conspiracy to defraud, the plaintiff must establish:

a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has the purpose. The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.

*Id.* (internal quotations and citations omitted). "Because the agreement does not need to be a formal one, plaintiffs can prove the existence of a conspiracy through circumstantial evidence, including inferences from the relationships among the parties." *Echols,* No. 01-2033, August 29, 2001 Order at 47 (citing *Dale,* 208 S.W.2d at 353). If the plaintiff succeeds in proving a conspiracy, "each conspirator is liable for all damages caused by the actions of any of his coconspirators in carrying out their common design." *Id.* (citing *Dale,* 208 S.W.2d at 354).

[31] Defendants argue that Plaintiff did not allege that Equity Title and Winkel committed an overt act in furtherance of the conspiracy. This argument fails to recognize, however, that because "each conspirator is responsible for everything done by his confederates which the execution of the common design makes probable as a consequence, ... each is liable for all damages naturally flowing from any wrongful act of a coconspirator in carrying out such common design." *Dale,* 208 S.W.2d at 354 (quotations omitted). Moreover, Plaintiff alleges in the complaint that Equity Title prepared the fraudulent closing documents and Winkel notarized at least one document despite his absence from the closing. This argument is therefore without merit.

Defendants also argue that Plaintiff's allegations only establish that Equity Title and Winkel were pursuing their own business*817 interests, i.e., to obtain money from Plaintiff. The fallacy of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

354 F.Supp.2d 789
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828
**(Cite as: 354 F.Supp.2d 789)**

Page 29

Defendants' argument, however, is that Plaintiff alleges that Equity Title and Winkel fraudulently attempted, and did in fact, obtain money belonging to Plaintiff. The Court finds that the complaint sufficiently pleads a claim for conspiracy as to these Defendants. Accordingly, Defendants' motion to dismiss Plaintiff's state law conspiracy claim is denied.

## IV. CONCLUSION

For the reasons stated herein, the Court grants Defendants Equity Title and Steven Winkel's motion to dismiss Plaintiff's claims for violation of 42 U.S.C. § 3605; 15 U.S.C. § 1691, *et seq.;* 15 U.S.C. § 1601, *et seq.;* and 12 U.S.C. § 2604(c), without legal prejudice. The Court also grants Defendants' motion to dismiss Plaintiff's claims for breach of contract and for "unconscionability," without legal prejudice. The Court, however, denies Defendant's motion to dismiss Plaintiff's claims for violation of 42 U.S.C. § 3604(b); 18 U.S.C. § 1962(c) and (d); 12 U.S.C. § 2607(b); and Tenn.Code Ann. § 47-18-109(a). Likewise, the Court denies Defendants' motion to dismiss Plaintiff's claims for fraud, breach of fiduciary duty, conspiracy, and negligent misrepresentation. Furthermore, the Court grants Plaintiff fifteen days from the issuance of this order to amend the complaint with respect to her claim for violation of 12 U.S.C. § 2607(b).

**IT IS SO ORDERED** this _____ day of February, 2005.

W.D.Tenn.,2005.
Beard v. Worldwide Mortgage Corp.
354 F.Supp.2d 789, RICO Bus.Disp.Guide 10,828

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 906366 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Day Management Corp. v. Mobex Communica-
tions, Inc.
D.Or.,2004.
Only the Westlaw citation is currently available.
        United States District Court,D. Oregon.
DAY MANAGEMENT CORPORATION, dba Day
Wireless Systems, an Oregon corporation, Plaintiff,
                        v.
MOBEX COMMUNICATIONS, INC., a Delaware
corporation; Mobex Network Services, LLC, fka
Regionet Wireless Licenses, LLC, a Delaware lim-
ited liability company; Regionet Wireless Opera-
tions, LLC, a Delaware limited liability company,
                    Defendants.
              **No. Civ. 03-1399-JE.**

                  April 28, 2004.

Jan D. Sokol, Lawrence A. Wagner, Stewart Sokol
& Gray, LLC, Portland, OR, for Plaintiff.
Kathryn P. Salyer, Kimberley Hanks McGair, Far-
leigh Wada & Witt, P.C., Portland, OR, for Defend-
ants.

                      ORDER

JELDERKS, Magistrate J.
    **\*1** Plaintiff Day Management Corporation
brings this breach of contract action against defend-
ants Mobex Communications, Inc., Mobex Network
Services, LLC, and Regionet Wireless Operations,
LLC. Defendants move to stay these proceedings
pending arbitration and to compel arbitration. I
deny the motion.

                   BACKGROUND

    Plaintiff filed this action on October 14, 2003.
In its first amended complaint, filed on October 29,
2003, plaintiff alleges that defendants breached the
parties' "Market Representative Agreement" and
"Initial Facility Lease Agreement."

    Section 13.10 of the Market Agreement
provides, in pertinent part, that:
    In the event of any controversy, dispute or
claim between parties arising under, out of or per-
taining to this Agreement, then all such controver-
sies, disputes or claims ... shall be resolved at New-
port Beach, California, by a general reference pur-
suant to California Code of Civil procedure
("CCP") Section 638.... It is the intent of the parties
to this Agreement that this general reference agree-
ment provision be specifically enforceable. All Dis-
putes shall be tried by a single referee under an or-
der of general reference to try all issues of fact and
law, whether legal or equitable. Said referee shall
be chosen by counsel for the parties hereto and
shall be a retired justice of a Court of Appeal or the
Supreme Court of the State of California with all
parties hereby waiving any right to trial by jury.

    Section 18 of the Lease Agreement provides, in
pertinent part, that:
    This Agreement shall be construed by and gov-
erned in accordance with the laws of the State of
California ... and all disputes shall be resolved in
the same manner as disputes under the Market Rep-
resentative Agreement.

    In an answer filed on November 21, 2003, de-
fendants asserted three affirmative defenses and
brought two counterclaims. The answer made no
reference to the "general reference" pursuant to
Section 638 of the California Code of Civil Proced-
ure provided for in the above Agreements.

    The parties attended a Rule 16 Conference with
the court on January 26, 2004. At that conference,
discovery was discussed, a discovery and disposit-
ive motions schedule was established, a pretrial or-
der lodging date was fixed, and defendants were
ordered to evaluate the case and make a settlement
proposal. However, defendants made no mention of
the provision for reference pursuant to Section 638
set out in the Agreements, and did not suggest that
they would assert that this district court was not a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 906366 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

proper forum for resolution of the parties' dispute. The parties have conducted discovery, including filing requests for admissions, interrogatories, and requests for production, and defendants have served notices for depositions to be taken on April 27, 2004, and May 3, 2004.

According to the affidavit of Kathryn Salyer, defendants' counsel, defendants first notified plaintiff's counsel on March 17, 2004, that defendants "were invoking their right to have the case resolved according to the dispute resolution procedures that the parties had bargained for and agreed to in their many contracts." Ms. Salyer further asserts that she asked plaintiff's counsel to "consent to a stay of the action so that the arbitration could proceed" in that letter. She adds that plaintiff's counsel "refused to consent to a stay of the arbitration agreement, indicating that he believed that defendants had waived this provision by 'failing to assert the provision as an affirmative defense or counterclaim.'"

**\*2** On April 8, 2004, plaintiff filed a motion for partial summary judgment. On the same day, defendants filed the pending motion, which is captioned "Motion to Compel Arbitration, Motion to Stay."

On April 14, 2004, defendants filed a motion to extend the time for filing a response to the motion for partial summary judgment until the court has ruled on the motion to compel/stay, and has allowed the time for taking certain depositions if the motion to compel/stay is denied. In their memorandum in support of the motion to extend time, defendants assert that they answered plaintiff's complaint in this court "because they wanted the ability to seek immediate injunctive relief from this Court in the event that plaintiff followed through on its threats and disrupted service to defendants' customers."

DISCUSSION

Defendants characterize the provision in the relevant agreements providing for resolution of disputes by a "general reference" pursuant to Section 638 as an arbitration clause, and contend that enforcement of this provision must be evaluated in light of the policy favoring enforcement of arbitration clauses reflected in the Federal Arbitration Act (FAA), 9 U.S.C. § 1-9. Defendants cite *Grigson v. Creative Artists Agency, L.L.C.,* 210 F.3d 524, 526-27 (5th Cir.2000) in support of their assertion that Section 638 is "commonly known in California as the 'Rent-A-Judge' procedure," and is the "equivalent of arbitration."

The procedure set out in Section 638 cannot be fairly characterized as "arbitration," and defendants' reliance on *Grigson* is misplaced. "California law provides for two kinds of arbitrations-nonbinding judicial arbitration under the Judicial Arbitration Act (JAA) (Code Civ. Proc., § 1141.10 et seq.) and binding contractual arbitration under the California Arbitration Act (CAA). (Code Civ. Proc., § 1280 et seq.)" *Heenan v. Sobati,* 96 Cal.App. 4th 995, 1000, 96 Cal.App.4th 995, 117 Cal.Rptr.2d 532 (2002). The "reference" method of dispute resolution specified in the parties' Agreements is clearly distinct from either a judicial arbitration, or the kind of "contractual arbitration" addressed in the FAA and the parallel California Arbitration Act. As the court noted in *Sy First Family Ltd. Partnership v. Cheung,* 70 Cal.App. 4th 1334, 1341, 70 Cal.App.4th 1334, 83 Cal.Rptr.2d 340 (1999), "[t]here are significant differences between a judicial reference and a contractual arbitration...." A hearing before a referee under Section 638 is conducted "as it would be before a court under the rules of evidence applicable to judicial proceedings" and a referee's decision "stands as a decision of the court and is reviewable ... as if the court had rendered it." *Id.* at 1341-42, 83 Cal.Rptr.2d 340. Arbitrators, by contrast, "are not bound to decide cases in accordance with the law and may base a decision on principles of justice and equity." *Id.* Unlike a referee's decision rendered in proceedings conducted pursuant to Section 638, the merits of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 906366 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

controversy resolved by contractual arbitration are not subject to judicial review. *Moncharsh v. Heily & Blase,* 3 Cal. 4th 1, 10, 10 Cal.Rptr.2d 183 (1992).

**\*3** The *Grigson* court was not required to determine whether a reference under Section 638 is the equivalent of arbitration, and did not hold or imply that an agreement to resolve a dispute under that section constitutes an agreement to arbitrate. Instead, the court simply recited the *parties' own* characterization of their dispute resolution agreement, which provided for resolution of any dispute by a "Rent-A-Judge" selected by the parties or appointed in accordance with Section 638, as the "equivalent of arbitration" that would be subject to the FAA. In the present action, the parties' Agreements provide not only for selection of a referee according to the provisions of Section 638, but for resolution of the entire dispute according to those procedures. Here, unlike *Grigson,* the parties do not agree that their dispute resolution mechanism is the "equivalent" of arbitration.

I have found no reported California decisions holding that Section 638 describes procedures that are the equivalent of arbitration, and the dispute resolution mechanism set out in that section is very different from the procedures applicable to contractual arbitration set out in § 1280 *etseq.* of the California Code of Civil Procedure.Under these circumstances, I cannot conclude that the parties' Agreements included arbitration clauses whose enforceability should be interpreted by reference to the FAA or its California counterpart. Accordingly, defendants' reliance on decisions analyzing the enforceability of arbitration agreements under the FAA and discussing when a party has waived reliance on an arbitration clause is misplaced.

This does not resolve the question whether defendants have waived their right to enforcement of the parties' agreement to resolve controversies "at Newport Beach, California, by general reference pursuant to California Code of Civil Procedure ("CCP") Section 638" by failing to raise it before

this court in earlier pleadings or motions. As noted above, Section 13.10 of the parties' Market Agreement provides that the agreement to resolve disputes according to the provisions of Section 638 is to be "specifically enforceable ." Accordingly, if defendants had responded to the filing of plaintiff's complaint with a pleading or timely motion seeking enforcement of the dispute resolution provision, there is little doubt that the court would have enforced the parties' dispute resolution agreement. Because they waited nearly five months to seek enforcement of that provision, the question now is whether defendants have waived reliance on the dispute resolution provision.

Because the provision in question is not an arbitration agreement, the court looks for guidance not from the law specifically applicable to waiver of arbitration agreements, but to the more general law of waiver. In analyzing this issue, I will apply the law of California, because it appears that the parties intended that the law of that state would apply to any disputes arising from their Agreements.FN1

> FN1. The Lease Agreement specifically provides that it shall be "construed by and governed in accordance with the laws of the State of California."Though I find no choice of law specified in the Market Agreement, provisions in that Agreement requiring dispute resolution under Section 638 "at Newport Beach, California" support the conclusion that the parties intended that California law apply to the Market Agreement as well.

**\*4** Under California law, "[w]aiver requires an existing right, benefit, or advantage, actual or constructive knowledge of the right's existence, and either an actual intention to relinquish it or conduct so inconsistent with any intent to enforce the right as to induce a reasonable belief that it has been relinquished."*Utility Audit Co., Inc. v. City of Los Angeles,* 112 Cal.App. 4th 950, 959, 112 Cal.App.4th 950, 5 Cal.Rptr.3d 520 (2003)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 906366 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

(citations omitted). Waiver must be established by a "clear showing" of the intent to relinquish a right, and the party asserting waiver bears the burden of establishing that a right has been waived. *Id.* (citations omitted).

Defendants were clearly on notice of their right to specifically enforce the dispute resolution mechanism set out in Section 13.10 of the Market Agreement. Any doubt that defendants had actual rather than mere constructive notice is eliminated by defendants' assertion that they decided to answer plaintiff's complaint without invoking the dispute resolution provisions of Section 13.10 because they wanted to be able to seek immediate injunctive relief from the court if they deemed such action necessary.

In answering the complaint without invoking the dispute resolution provision in question, defendants at least temporarily relinquished the right to require that the dispute be resolved in Newport Beach, California, pursuant to Section 638. That decision, which continued with defendants' participation in proceedings before this court and participation in the discovery process without invoking Section 13.10, was clearly inconsistent with any intent to enforce the dispute resolution provision. Defendants' failure to assert the right to enforce § 13.10 over a period of five months would support the reasonable conclusion that defendants relinquished the right to enforce that provision.

Given their conscious decision not to exercise their right to require resolution of the present dispute through a "general reference" under Section 638 through the proceedings up to this point, I conclude that defendants have effectively waived their right to rely on that the dispute resolution provision in the parties' Agreements. As noted above, the dispute resolution provision in question is not an arbitration agreement, and the federal policy of favoring arbitration agreements upon which defendants rely is inapplicable. Under the circumstances presented here, I find no principled basis in the law or logic for allowing defendants to in effect withdraw their

waiver of the right to have this dispute resolved in another forum. I therefore deny defendants' purported motion to compel arbitration.

### CONCLUSION

Defendants' "motion to stay and to compel arbitration" (# 18) is DENIED.

D.Or.,2004.
Day Management Corp. v. Mobex Communications, Inc.
Not Reported in F.Supp.2d, 2004 WL 906366 (D.Or.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
The **Flag** Co. v. **Maynard**
D.Or.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
THE **FLAG** CO., Plaintiff,
v.
Bill **MAYNARD**, Steve Adams, and Ronald
Thomas a/k/a/ Ronald Rothstein, Defendants.
**No. CV 05-1194-HU.**

April 17, 2006.

Jeffrey A. Johnson, Cosgrave Vergeer Kester LLP,
Portland, OR, Howard Foster, Johnson & Bell, Ltd.,
Chicago, IL, for Plaintiff.
George J. Cooper, Dunn Carney Allen Higgins &
Tongue LLP, Portland, OR, Mary Ann L. Wymore,
Greensfelder, Hemker & Gale, P.C., St. Louis, MO,
for Defendants Maynard & Adams.
James S. Cromar, Helzer & Cromar, Beaverton,
OR, Griswold L. Ware, Vurdelja & Heaphy, Chica-
go, IL, for Defendant Rothstein a/k/a/Thomas.

FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge.
  *1 Plaintiff The Flag Company brings this ac-
tion under the Racketeer Influenced and Corrupt
Organizations Act (RICO), 18 U.S.C. §§
1961-1968, against defendants Bill Maynard, Steve
Adams, and Ronald Thomas a/k/a Ronald Rothstein
FN1. Defendants move to dismiss the Second
Amended Complaint for failure to state a claim. I
recommend that the motions be denied.

    FN1. For ease of reference, I refer to this
    defendant simply as Rothstein.

BACKGROUND

  Plaintiff brings two RICO claims: one under 18
U.S.C. § 1962(c) and the other under 18 U.S.C. §
1962(d). Plaintiff alleges that defendants conspired
to induce it to purchase "blast faxing" services

through fraudulent interstate wire transmissions.
Plaintiff defines "blast faxing" as the sending of
large numbers of unsolicited facsimile advertise-
ments to potential customers throughout the nation.
Sec. Am. Compl. at ¶ 2.

  Plaintiff alleges that it is a Georgia corporation,
with its principal place of business there. *Id.* at ¶
11.Adams and Maynard are believed to be Cana-
dian citizens and are alleged to be Vice-President
and Sales Director, respectively, for Protus IP Solu-
tions (Protus).*Id.* at ¶¶ 12, 20, 22.Rothstein is a cit-
izen of Oregon and is a Senior Sales Executive of
Protus.*Id.* at ¶¶ 12, 16.

  On February 5, 2004, Rothstein sent a fax mes-
sage from California to plaintiff, offering
"broadcast faxing" services for the rate of 1.9 cents
per page. *Id.* at ¶ 16.Plaintiff expressed interest in
obtaining the fax services and Michael Lawrence,
plaintiff's Vice-President, called Rothstein and
offered to purchase the services for a fee from Pro-
tus. *Id.* at ¶ 17.

  Rothstein agreed to provide "blast fax" services
to plaintiff in a telephone call from California to
Lawrence, in Georgia, in February 2004. *Id.* at ¶
18.Rothstein did not tell Lawrence that the blast fax
services Rothstein was selling, were illegal under
the Telephone Consumer Protection Act (TCPA),
47 U.S.C. § 227, or that sending the blast faxes
would subject plaintiff to civil liability from the
blast fax recipients. *Id.* Rothstein allegedly knew
both of the illegality of the blast faxes and that
sending them would subject plaintiff to civil liabil-
ity. *Id.*

  Plaintiff would not have purchased the blast
fax services from Protus if it had known they were
illegal. *Id.* at ¶ 19.

  Rothstein, in furtherance of the scheme to de-
fraud plaintiff into purchasing Protus's services, dir-
ected Adams, allegedly Rothstein's co-conspirator,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

to send an email to plaintiff confirming the agreement to provide the blast fax services. *Id.* at ¶ 20.Adams sent the email from Protus's offices in Canada, to Lawrence on March 5, 2004. *Id.* In the email, Adams made the statement that "[o]ver 90% of users are happy with our service...."*Id* .Plaintiff alleges that this statement was knowingly false because the truth is that Protus's customers were unhappy with the blast fax services because they are illegal and have resulted in many lawsuits against Protus's customers. *Id.* Adams allegedly knew about those lawsuits. *Id.*

**\*2** Rothstein and Adams then caused other emails to be sent from Protus in Canada to plaintiff in Georgia, finalizing the billing for blast fax services.*Id.* at ¶ 21.These emails, dated March 5, 2004, March 23, 2004, and March 31, 2004, were all allegedly fraudulent and furthered the scheme by omitting to inform plaintiff that the blast fax services it was purchasing were illegal.*Id.*

Thereafter, in March 2004, Adams, Rothstein, and alleged co-conspirator Maynard, caused the blast fax to be sent from Canada to thousands of businesses in the United States, advertising plaintiff's products. *Id.* at ¶ 22.Plaintiff alleges that each one of these faxes used the interstate wires and was sent in furtherance of the scheme to defraud plaintiff. *Id.*

On April 1, 2004, Maynard sent Lawrence an email confirming that the blast fax campaign had concluded. *Id.* at ¶ 23.Plaintiff alleges that this email was in furtherance of the scheme as the email omitted to inform plaintiff that the blast fax campaign was unlawful. *Id.*

Plaintiff was sued in a putative class action for TCPA violations as a result of the blast fax campaign. *Id.* at ¶ 24.After being sued, Maynard called Lawrence. *Id.* at ¶ 26.During this call, Lawrence told Maynard about the class action. *Id.* Maynard stated "[d]id you get the $500 letter or the $1500 letter?"*Id.* at ¶ 27.Plaintiff contends that this statement referred to demands for violations of the

TCPA and as such, it reveals Maynard's knowledge of the TCPA and the illegality of the blast fax campaign. *Id.* at ¶ 27.Accordingly, plaintiff alleges, all three co-conspirators were at all times aware that blast faxing is illegal and failed to tell plaintiff or Lawrence of this fact. *Id.* at ¶ 28.Plaintiff alleges that defendants perpetrated the scheme in order to obtain blast faxing service contracts from unwitting businesses. *Id.*

Plaintiff then makes a series of allegations directed more specifically to its RICO claims. Plaintiff contends that defendants perpetrated the scheme and sent the interstate wire communications and emails through their participation in Protus, which plaintiff asserts is a business entity which affects interstate and foreign commerce through its contracts with United States businesses.*Id.* at ¶ 29.Protus has allegedly entered into numerous contracts with United States businesses for blast fax services which have subjected these businesses to liability, thereby causing effects in the United States. *Id.* Defendants hatched and carried out the scheme by virtue of their participation in and management of Protus and on behalf of Protus. *Id.* at ¶ 30.

Plaintiff contends that all of the fax transmissions and emails were sent in furtherance of the scheme in violation of the federal wire fraud statute, 18 U.S.C. § 1343. *Id.* at ¶ 32.The use of the wires to further the scheme was repeated, "and involves thousands of individual faxes to Flag Co. and the recipients of the blast faxes."*Id.* at ¶ 33.This is alleged to be a pattern of racketeering activity as it has occurred over months and is an ongoing, open and continuous manner of conducting Protus's business. *Id.*

**\*3** Plaintiff contends that the manner in which defendants deceived plaintiff into purchasing blast fax services is typical of the way defendants have fraudulently induced many other businesses into similarly engaging their services, that is, through mail and wire fraud. *Id.* at ¶ 34.Plaintiff is aware of three other such victims and contends that all three

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

of these firms were defrauded by defendants and their co-conspirators at Protus, into purchasing blast fax services since 2002, through deceptive solicitations sent by interstate wires. *Id.* All three of the firms were subsequently sued for TCPA violations. *Id.* Therefore, plaintiff alleges that defendants, pursuant to the conspiracy, have victimized other entities in precisely the same way defendants victimized plaintiff. *Id.* at ¶ 35.Plaintiff contends that defendants will continue perpetrating the scheme against future customers of Protus until halted by judicial intervention. *Id.* at ¶ 36.

Plaintiff contends that the three defendants have conspired to perpetrate the scheme, with other as of yet unnamed co-conspirators operating through the Protus enterprise. *Id.* at ¶ 37.This conspiracy was allegedly entered into to violate section 1962(c), by participating in the Protus enterprise through a pattern of wire-fraud ("the scheme").*Id.* at ¶ 38.This conspiracy to violation section 1962(c) is alleged to be a violation of section 1962(d).*Id.* at ¶ 39.

Finally, plaintiff alleges that it has a real and reasonable apprehension of further litigation by recipients of the blast fax until the statute of limitations expires on March 30, 2008, four years from the date of the last blast fax. *Id.* at ¶ 40.

## STANDARDS

On a motion to dismiss, the court must review the sufficiency of the complaint. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The court should construe the complaint most favorably to the pleader:

In appraising the sufficiency of the complaint, we follow, of course, the accepted rule that the complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *American Family Ass'n, Inc. v. City & County of San Francisco,* 277 F.3d 1114, 1120 (9th Cir.2002). The allegations of material fact must be taken as true. *Moyo v. Gomez,* 40 F.3d 982, 984 (9th Cir.1994). However, the court need not accept conclusory allegations as truthful. *Holden v. Hagopian,* 978 F.2d 1115, 1121 (9th Cir.1992).

## DISCUSSION

Defendants move to dismiss both of plaintiff's RICO claims. Defendants also contend that plaintiff fails to plead that its damages were proximately caused by defendants' alleged misconduct, as required by section 1964(c) of the RICO statutes. Finally, defendants argue that plaintiff fails to plead its claims with particularity under Federal Rule of Civil Procedure 9(b).

I. Section 1962(c) Claim

*4 18 U.S.C. § 1962(c) provides that it
shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

18 U.S.C. § 1962(c).

A "person" includes "any individual or entity capable of holding a legal or beneficial interest in property[.]"18 U.S.C. § 1961(3). An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity[ .]"18 U.S.C. § 1961(4).

"Racketeering activity" comprises a series of named criminal acts or violations of enumerated statutes, including 18 U.S.C. § 1343 relating to wire fraud. 18 U.S.C. § 1961(1). A "pattern of racketeering activity" requires proof of at least two predicate acts of racketeering activity within a ten-year peri-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

od. 18 U.S.C. § 1961(5). The predicate acts must be related and must amount to or pose a threat of continued criminal activity. *H.J., Inc. v. Northwestern Bell,* 492 U.S. 229, 239 (1989); see *also Cooper Indus., Inc. v. Lagrand Tire Chains,* 205 F.Supp.2d 1157, 1165 (D .Or.2002) ("courts have determined that a pattern must be based on at least two acts of racketeering, must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity.").

Under a section 1962(c) RICO claim, plaintiff must allege "(1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."*Miller v. Yokohama Tire Corp.,* 358 F.3d 616, 620 (9th Cir.2004) (internal quotation omitted). Defendants contend that plaintiff fails to allege a continuing pattern of racketeering activity.

A. Pattern

Establishment of a pattern "requires the showing of a relationship between the predicates and of the threat of continuing activity."*Howard v. America Online Inc.,* 208 F.3d 741, 749 (9th Cir.2000) (internal quotation omitted)." 'Related conduct' embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events."*Id.* (internal quotation omitted).

"To satisfy the continuing requirement, [plaintiff] must prove either a series of related predicates extending over a substantial period of time ... or past conduct that by its nature projects into the future with a threat of repetition."*Id.* at 750 (internal quotation omitted). The former circumstance is considered "closed-ended continuity" and the latter circumstance is considered "open-ended continuity." *Id.*

Plaintiff relies on an open-ended continuity to support its "pattern" argument. Defendants maintain that plaintiff cannot satisfy the open-ended continuity requirement because it cannot show a threat of future repetition of criminal activity given the April 2004 email confirming that the blast fax campaign had concluded.

**\*5** Plaintiff points to the following allegations in the Second Amended Complaint which it contends sufficiently allege an open-ended, ongoing pattern of racketeering activity:

(1) "[defendants'] scheme, which is open and ongoing, is to deceive innocent business owners throughout the U.S. into purchasing their 'blast fax' services"; Sec. Am. Comp. at ¶ 2;

(2) the three conspirators sent seven separate interstate phone, email, and fax communications from California and Canada to plaintiff in Georgia in order to induce plaintiff to purchase the blast fax services from Protus and to execute the contract; *Id.* at ¶¶ 16 (Feb. 5, 2004 fax from Rothstein), 18 (Feb.2004 phone call from Rothstein), 20 (Mar. 5, 2004 email from Adams), 21 (Mar. 5, 2004, Mar. 23, 2004, and Mar. 31, 2004 emails from Rothstein or Adams); 23 (Apr. 1, 2004 email from Maynard);

(3) defendants have perpetrated the scheme against three other named victims; *Id.* at ¶ 34;

(4) the manner in which defendants deceived plaintiff "into purchasing the blast fax services is typical of the way they have fraudulently induced many other businesses from similarly engaging their services-through mail and wire fraud"; *Id.*

(5) defendants, "pursuant to the conspiracy have victimized other entities in precisely the same way"; *Id.*

(6) the "co-conspirators will continue perpetrating the scheme against future customers of Protus until halted by judicial intervention."*Id.*

The "standard for showing open-ended continuity is extremely low ."*Sebastian Int'l, Inc. v. Russolillo,* 186 F.Supp.2d 1055, 1067 (C.D.Cal.2000). In making this statement, the *Se-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

*bastian* court cited two Ninth Circuit cases. First, in *Ikuno v. Yip,* 912 F.2d 306 (9th Cir.1990), although the case involved the filing of false annual reports only twice in one year, the court concluded continuity was established because there was no evidence that the defendant would have stopped filing false annual reports if the company had not stopped doing business. *Id.* at 309.Second, in a more recent case which was an appeal of a Rule 12(b)(6) dismissal, the Ninth Circuit held that the defendants' "willingness to participate in the kickback scheme and their affirmative misrepresentations ... demonstrate that if they had not been fortuitously interrupted by termination, the predicate acts could have recurred indefinitely."*Allwaste, Inc. v. Hecht,* 65 F.3d 1523, 1530 (9th Cir.1995).

Based on these cases, the court in *Sebastian* held that the plaintiff had sufficiently pleaded the requirement for an open-ended continuity by alleging that the defendants were in a position to continue their scheme of distributing counterfeit hair care products and there was no evidence to suggest that defendants, if able, would not continue to distribute counterfeit products.*Sebastian,* 186 F.Supp.2d at 1067.

*Howard,* the case on which defendants rely, is distinguishable. There, the court found no threat of continuing fraud because the plaintiffs "failed to state facts that reasonably imply that [defendant] would continue its false advertising past February 1997" as the alleged fraud "stemmed from a one-time change in pricing policy."*Howard,* 208 F.3d at 750. In contrast, plaintiff here alleges that the fraudulent conduct is a "regular way of doing business." *See Allwaste,* 65 F.3d at 1528 ("Open-ended continuity is shown by past conduct that by its nature projects into the future with a threat of repetition [, ... i.e. p]redicate acts that specifically threaten repetition or that become a regular way of doing business[.]") (citation omitted).

*6 Here, plaintiff identifies three other victims of the same scheme, by name, contends that they were similarly defrauded, contends that the way

plaintiff was defrauded is typical of the way defendants have induced others, and contends that defendants will continue to perpetrate the scheme. This sufficiently states an open-ended continuity and satisfies the requirement of pleading a pattern of racketeering activity.

## B. Racketeering Activity

The commission of wire fraud in violation of 18 U.S.C. § 1343 satisfies the "racketeering activity" element. 18 U.S.C. § 1961(1); *Turner v. Cook,* 362 F.3d 1219, 1229 (9th Cir.) ("racketeering activity" is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of ... wire fraud[.]"), *cert. denied,*125 S.Ct. 498 (2004).

To support a claim for wire fraud in violation of 18 U.S.C. § 1343 as a RICO predicate act, plaintiff must plead that (1) there was a scheme to defraud; (2) defendants used the wires in furtherance of the scheme; and (3) defendants had specific intent to deceive or defraud. *United States v. Garlick,* 240 F.3d 789, 792 (9th Cir.2001). Each use of the wires under the wire fraud statute constitutes a separate offense. *Id.*

Defendants contend that plaintiff fails to sufficiently allege that there was a fraudulent scheme and that defendants had a specific intent to deceive or defraud.

### 1. Scheme

Defendants contend that plaintiff's Second Amended Complaint fails to show a furtherance of a scheme because (1) a scheme to defraud ordinarily requires an affirmative misrepresentation and no exceptions are present, and (2) the only misrepresentation at issue in this case is one of law which does not constitute actionable fraud under RICO.

#### a. Affirmative Misrepresentation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

In the Ninth Circuit, "non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged."*United States v. Dowling,* 739 F.2d 1445, 1449 (9th Cir.1984), *rev'd on other grounds,*473 U.S. 207 (1985)."This independent duty may exist in the form of a fiduciary duty to third parties, ..., or may derive from an independent explicit statutory duty created by legislative enactment."*Id.* (citation omitted); *see also California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1472 (9th Cir.1987) ("Absent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a fraudulent scheme.").

I need not determine whether the facts alleged reveal a fiduciary duty or other independent duty owed by defendants to plaintiff and which would allow plaintiff to proceed with a claim based on non-disclosures. Defendants acknowledge that there is one affirmative misrepresentation alleged in the Second Amended Complaint. In paragraph 20, plaintiff alleges that Adams stated, in an email, that "[o]ver 90% of users are happy with our service ..." Sec. Am. Compl. at ¶ 20. Defendants contend, however, that even if this affirmative statement is false, it cannot support an allegation of wire fraud because it is not material and is only common "sales puffing." Because this is a Rule 12(b)(6) motion to dismiss, I reject this argument.

**\*7** The materiality of this statement, whether it is puffery or something more, and whether it was reasonable for plaintiff to be deceived by it, are issues of fact to be determined by the factfinder. I cannot conclude that as a matter of law, this affirmative misrepresentation is insufficient to support a wire fraud allegation. Moreover, reading the allegations in a light most favorable to plaintiff, this statement by Adams could be viewed as an implied representation that Protus's services were legal. Whether a misrepresentation of law is actionable as wire fraud is discussed immediately below, but assuming it is, the implication created by the affirm-

ative statement is sufficient.

b. Misrepresentation of Law

Generally, "fraud cannot be predicated upon misrepresentations of law or misrepresentations as to matters of law."*Miller,* 358 F.3d at 620 (internal quotation omitted)."Statements of domestic law are normally regarded as expressions of opinion which are generally not actionable in fraud even if they are false."*Id.*

In *Miller,* the plaintiff alleged that several managers of defendant falsely represented to him and other employees that they were not entitled to overtime because they were salaried. *Id.* He contended that because he was not an attorney and was not familiar with the law or regulations concerning entitlement to overtime pay, he trusted and placed confidence in his employer who he argued possessed superior knowledge concerning his status and his right to receive overtime. *Id.*

His section 1962(c) RICO claim alleged predicate acts of wire fraud and mail fraud based on his receipt of twice monthly paychecks and annual W-2s, and based on other employees' receipt of payment via direct deposit. *Id.* at 619.He contended that the scheme to deny overtime pay was furthered through these paycheck-related mailings and wire transfers. *Id.*

On appeal of the district court's order granting the defendant's motion to dismiss, the threshold issue in the case was the plaintiff's argument that an employer's misrepresentation of the law to an employee constitutes actionable fraud. *Id.* at 620.After noting the general rule set out above, the court recited the following exceptions:
[w]here the party making the misrepresentation 1) purports to have special knowledge; 2) stands in a fiduciary or similar relation of trust and confidence to the recipient; 3) has successfully endeavored to secure the confidence of the recipient; 4) or has some other special reason to expect that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

the recipient will rely on his opinion[.]

*Id.* In these situations, misrepresentations of law may result in actionable fraud. *Id.*

Plaintiff contends that the exceptions in *Miller* apply here. I agree with defendants that the Second Amended Compliant suggests no evidence of a fiduciary or similar relationship of trust and confidence between the parties.

I further agree with defendants that the allegations in the Second Amended Complaint do not come within the "securing confidence" exception. In regard to that exception, the *Miller* court stated that the comments to the Restatement (Second) of Torts § 542, explained that the securing confidence rule is "usually applicable to situations where 'the maker gains the other's confidence by stressing their common membership in a religious denomination, fraternal order, or social group or the fact that they were born in the same locality.' " *Id.* at 622 (quoting Restatement (Second) of Torts § 542(c), cmt. h). The court remarked that the only illustration given in the Restatement is a situation where after years of giving an elderly widow good investment advice, a "friend" advises her to buy worthless stock from him. *Id.* Here, as in *Miller,* the facts presented by plaintiff are not like the illustration.

**\*8** I also agree with defendants that the "other special reason" exception is not implicated by the facts alleged. The *Miller* court noted that this exception is typically applied to cases " 'in which the maker of representation knows of some special characteristic of the recipient, such as a lack of intelligence ... which gives the maker special reason to expect the opinion to be relied on.' " *Id.* (quoting Restatement (Second) of Torts § 542(c), cmt. I).

I disagree with defendants, however, on the issue of the special knowledge exception. In *Miller,* the court rejected a similar argument by the plaintiff because the plaintiff did not "allege facts to support superior knowledge," and the court was unwilling "to impute hypothetical knowledge on the

basis of the facts alleged ."*Id.* at 620.In contrast, in *Peterson v. Auvel,* 275 Or. 633, 640, 552 P.2d 538, 542 (1976), the court found the defendants' representations actionable because they were real estate brokers with superior knowledge that their statements of opinion as to the legal consequences of the earnest money agreement were false).

This case is more like *Peterson* than *Miller.*In *Miller,* there was no basis for the court to believe that an employer has any special knowledge regarding wage and hour laws. In contrast, here, it is reasonable to conclude that a business selling a product or a service, would possess superior knowledge about the industry within which it operates and the products or services it sells. Unlike in *Miller,* imputing superior knowledge about blast faxing services to defendants is reasonable based on the facts alleged.

### 2. Specific Intent to Defraud

Defendants argue that plaintiff has not sufficiently alleged that defendants had the requisite intent to defraud because plaintiff fails to allege that any defendant or Protus intentionally entered a scheme to violate the TCPA, or fails to allege facts from which such intent may be inferred. The basis of defendants' argument is that plaintiff alleges only that Rothstein purportedly solicited plaintiff to purchase "broadcast fax services" from Protus, which, defendants assert, are not necessarily illegal under the TCPA. Because, according to defendants, the TCPA outlaws only *"unsolicited* advertisements," 47 U.S.C. § 227(b)(1)(C) (emphasis added), an allegation based only on a solicitation to purchase broadcast faxes does not implicate illegal TCPA activity.

This argument ignores plaintiff's allegation that the alleged scheme was one designed to deceive innocent business owners into purchasing "blast fax" services which plaintiff expressly defines as the sending of "a large number of unsolicited facsimile advertisements to potential customers throughout

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

the nation."Sec. Am. Compl. at ¶ 2. Rothstein is then alleged to have agreed to provide such "blast fax" services to plaintiff in a February 2004 phone call.*Id.* at ¶ 18.Thus, a fair reading of the allegations is that Rothstein's solicitation was not for broadcast fax services generally, but was for blast fax services which, by definition in the Second Amended Complaint, are illegal.

**\*9** Where a defendant knows that customers are being defrauded, specific intent to defraud is shown. *United States v. Peters,* 962 F.2d 1410, 1414 (9th Cir.1992). Specific intent to defraud in mail or wire fraud cases can be "inferred from the defendant's statements and conduct."*United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir.1979). One who acts with reckless indifference as to whether a representation is true or false is charged with the knowledge of its falsity. *United States v. Love,* 535 F.2d 1152, 1157-58 (9th Cir.1976).

In addition to the allegations recited above regarding defendants' alleged deception of innocent business owners into purchasing blast fax services which are defined as illegal under the TCPA by virtue of being unsolicited, plaintiff further alleges Rothstein agreed to provide the blast fax services, that it has been sued under the TCPA several times by recipients of the blast fax, and that Maynard allegedly asked Lawrence in a phone call after being informed that plaintiff was being sued if plaintiff "got the $500 letter or the $1500 letter?"Sec. Am. Compl. at ¶¶ 3, 18, 27.

By incorporating "unsolicited" in its definition of blast fax, the illegality is alleged. Maynard's comment is enough from which to infer knowledge. By defining the illegal scheme as consisting of sending a large number of unsolicited faxes, along with the other allegations, particularly Maynard's alleged comment about the $500 or the $1500 letter, plaintiff alleges facts sufficient to raise an inference of a specific intent to defraud.

II. Section 1962(d) Claim

Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

Defendants first argue that the section 1962(d) claim fails because of the failure of the section 1962(c) claim. *Wagh v. Metris Direct, Inc.,* 363 F.3d 821, 831 (9th Cir.2003) (affirming dismissal of section 1962(d) claim for failure to state a claim when plaintiff had not satisfied the pleading requirements for subsections 1962(a), (b), or (c)), *cert. denied,*541 U.S. 1043 (2004). Because plaintiff has stated a section 1962(c) claim, this argument is without merit.

Defendants alternatively contend that the section 1962(d) claim fails of its own accord. "[T]o establish a violation of section 1962(d), [plaintiff] must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate offenses."*Howard,* 208 F.3d at 751. Further,

"[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."*Salinas v. United States,* 522 U.S. 52, 65 (1997)."A defendant must also have been aware of the essential nature and scope of the enterprise and intended to participate in it."*Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir.1993).

**\*10** *Id.*

Defendants argue that plaintiff fails to (1) allege with particularity facts from which to infer that defendants agreed to participate in an alleged enterprise; and (2) allege with particularity facts from which to infer that defendants agreed to the commission of two predicate acts in furtherance of the purported enterprise.

A. Agreement to Participate in an Enterprise

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendants contend that plaintiff's conclusory allegation that "[t] he three defendants have conspired, as detailed, to perpetrate the scheme," Sec. Am. Compl. at ¶ 37, is insufficient to support an allegation that they agreed to participate in an enterprise to violate RICO because plaintiff fails to "detail" any facts indicating that defendants knowingly agreed to violate section 1962(c). Moreover, defendants contend, plaintiff provides no details as to the roles played by the individual defendants, nor does it allege any facts indicating an agreement by the individual defendants as to which roles they would play in the alleged enterprise.

I disagree. Plaintiff alleges that all three defendants worked for Protus and specifically alleges the positions they held in the company. Sec. Am. Comp. at ¶¶ 16 (Rothstein is Senior Sales Executive of Protus); 20 (Adams is Vice-President of Marketing for Protus); 22 (Maynard is Sales Director for Protus).

Plaintiff then alleges that all "three co-conspirators hatched and carried out the scheme by virtue of their participation in the operation and management of Protus and on behalf of Protus."*Id.* at ¶ 30;*see also id.* at ¶ 29 ("[t]he co-conspirators perpetrated the scheme and sent the interstate wire communications and emails pled above through their participation in Protus."). While these allegations are somewhat conclusory, they sufficiently suggest that defendants' relationships with and participation in Protus is central to the alleged scheme.

As recited in the background section above, all three defendants are alleged to have sent either an email or a fax, or made a phone call, in connection with Protus's sale of blast fax services to plaintiff. Plaintiff contends that the three defendants conspired to perpetrate the scheme and that the conspiracy was entered in order to violate section 1962(c) by participating in the Protus enterprise through a pattern of wire fraud. *Id.* at ¶¶ 37, 38.

While this is a close question, I conclude that these allegations suffice as allegations that defend-

ants agreed to participate in an enterprise. Plaintiff's allegations that all three defendants held fairly high positions in Protus, that they perpetrated the alleged scheme through Protus, that the emails, faxes, and phone calls were largely conducted from Protus's offices in Canada, and that Maynard made the comment about plaintiff receiving the $500 letter or the $1500 letter, are capable of supporting inferences that (1) each defendant was a member of an enterprise (defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"; 18 U.S.C. § 1961(4)); (2) each defendant agreed to participate in the sale of blast fax services (the scheme); and (3) the scheme violated the wire fraud statute.

**\*11** "[A] defendant is guilty of conspiracy to violate § 1962 [and thus, is guilty of violating section 1962(d) ], if the evidence showed that she knowingly agreed to facilitate a scheme which includes the operation or management of a RICO enterprise."*United States v. Fernandez,* 388 F.3d 1199, 1230 (9th Cir.2004) (internal quotation omitted), *cert. denied,*125 S.Ct. 2286 (2005). Additionally, "[t]he illegal agreement need not be express as long as its existence can be inferred from words, actions, or interdependence of activities and persons involved."*Oki Semiconductor Co. v. Wells Fargo Bank,* 298 F.3d 768, 775 (9th Cir.2002).

On a motion to dismiss, the allegations recited above are enough to allege that there was an agreement to participate in an violate RICO. While the Second Amended Complaint conspiracy allegations, ("the three defendants have. to perpetrate the scheme"), the allegations are withstand a Rule 12(b)(6) motion.

**B. Agreement to Commission of Two Predicate Acts**

Defendants argue that if they did not agree to the commission of crimes that constitute a pattern of racketeering activity, there can be no violation of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

Page 10

section 1962(d). Defendants maintain that, as discussed above in connection with the section 1962(c) claim, plaintiff fails to adequately allege the predicate act of wire fraud and moreover, the Second Amended Complaint is devoid of allegations concerning any agreement of defendants as to the commission of the alleged wire fraud transaction. Finally, they contend that section 1962(d) is not violated even if they agreed to the commission of two criminal acts, but do not consent to the involvement of an enterprise. *Id.*

A 1993 Ninth Circuit case, quoting from a Seventh Circuit case, notes the distinction between an agreement to participate in an enterprise and an agreement to commit predicate acts:

"From a conceptual standpoint a conspiracy to violate RICO can be analyzed as composed of two agreements (in reality they would be encompassed by the same manifestations of the defendant): an agreement to conduct or participate in the affairs of an enterprise and an agreement to the commission of at least two predicate acts. Thus, a defendant who did not agree to the commission of crimes constituting a pattern of racketeering activity is not in violation of section 1962(d), even though he is somehow affiliated with a RICO enterprise, and neither is the defendant who agrees to the commission of two criminal acts but does not consent to the involvement of the enterprise. If either aspect of the agreement is lacking then there is insufficient evidence that the defendant embraced the objective of the alleged conspiracy. Thus, mere association with the enterprise would not constitute an actionable § 1962(d) violation. In a RICO conspiracy, as in all conspiracies, agreement is essential."

*Baumer v. Pachl,* 8 F.3d 1341, 1346 (9th Cir.1993) (quoting *United States v. Neapolitan,* 791 F.2d 489, 499 (7th Cir.1986)).

**\*12** As recognized in *Baumer,* the two separate agreements may be based upon the "same manifestations of the defendant[.]" *Id.*First, as discussed above, I conclude that the Second Amended Complaint states a section 1962(c) claim and thus,

plaintiff has adequately alleged the predicate act of wire fraud. Second, the allegations noted above in the section regarding the agreement to participate in an enterprise, also support a conclusion that the Second Amended Complaint adequately alleges an agreement to commit at least two predicate acts. Again, given that all three defendants are alleged to be high-ranking employees of Protus, that they perpetrated the scheme through Protus, that the emails, faxes, and phone calls were conducted by all three of the defendants at different times from, for the most part, Protus's offices in Canada (suggesting they worked together to promote and sell the service), and that Maynard inquired whether plaintiff received the $500 or the $1500 letter, there is enough to show an agreement to commit at least two predicate acts of wire fraud.

### III. Causation

Defendants contend that plaintiff's section 1962(c) and (d) claims must be dismissed because plaintiff fails to plead proximate causation as required under RICO. 18 U.S.C. § 1964(c) is the civil remedies provision for section 1962 claims. It states that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee[.]"18 U.S.C. § 1964(c).

Section 1964(c) contains a causation requirement. *Holmes v. Securities Investor Prot. Corp.,* 503 U.S. 258, 268-69 (1992)."A plaintiff must show that the defendant's RICO violation was not only a 'but for' cause of his injury, but that it was the proximate cause as well."*Oki Semiconductor,* 298 F.3d at 773. Proximate cause "of an injury is a substantial factor in the sequence of responsible causation."*Id.* (internal quotation omitted). Some "direct relationship" between the injury asserted and the injurious conduct is necessary. *Id.* (internal quotation omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
(Cite as: Not Reported in F.Supp.2d)

The Second Amended Complaint alleges that plaintiff "has been proximately damaged by the co-conspirators' pattern of racketeering activity, the wire fraud violations, all in furtherance of the scheme."Sec. Am. Compl. at ¶ 41. Plaintiff alleges that it has been sued several times by recipients of the blast fax pursuant to the TCPA. *Id.* at ¶ 3. In March 2004, it paid $350 to settle a dispute caused by the blast faxing in Massachusetts. *Id.* at ¶ 4. In May 2005, it settled a case for $8,000. *Id.* at ¶ 6.

Plaintiff seeks to recover the damages it paid to settle these lawsuits, attorney's fees, and "other costs such as the market value of lost time and inconvenience."*Id.* at ¶ 9. Plaintiff also seeks a declaratory judgment that defendants are legally responsible for any future claims against it stemming from the blast fax. *Id.* at ¶ 43.

**\*13** I need not decide at this point whether damages for lost time and inconvenience or for attorney's fees spent defending the third-party litigation against plaintiff, are recoverable under section 1964(c) because I conclude that the damages plaintiff paid in settlement of the third-party litigation against it meets the proximate cause standard required by section 1964(c). Plaintiff is entitled to recover "for money [it] paid out as a result of racketeering activity[ ]" as long as plaintiff proves a "concrete financial loss." *Imagineering, Inc. v. Kiewit Pac. Co.,* 976 F.2d 1303, 1310, 1311 (9th Cir.1992). Here, settlement payments to third parties are a concrete financial loss.

If the allegations in support of the section 1962(c) and 1962(d) claims prove to be true, defendant's failure to inform plaintiff of the illegality of the blast faxes appears to have been a substantial factor in plaintiff suffering the alleged concrete financial losses. Plaintiff alleges that it would not have purchased the services if it had known they were illegal. Sec. Am. Compl. at ¶ 19. Without this knowledge, plaintiff purchased the services, subjecting it to liability from the fax recipients. This is a sufficient "direct relationship" between the injury asserted and the injurious conduct.

**IV. Rule 9(b).**

Defendants contend that plaintiff's Second Amended Complaint fails to meet the requirements of Rule 9(b), which is required for civil RICO claims alleging mail or wire fraud. *Lancaster Comm. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 405 (9th Cir.1991) (civil RICO complaint is subject to the heightened pleading standard of Rule 9(b) which requires a plaintiff to plead fraud with particularity of time, place, and manner of each act of fraud, plus the role of each defendant in each scheme).

Under Rule 9(b), a complaint must "state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation."*Alan Neuman Prods., Inc. v. Albright,* 862 F.2d 1388, 1392-92 (9th Cir.1989). Additionally, "[t]he plaintiff must set forth what is false or misleading about a statement, and why it is false. In other words, the plaintiff must set forth an explanation as to why the statement or omission complained of was false or misleading."*In re Glenfed, Inc. Sec. Litig.,* 42 F.3d 1541, 1548 (9th Cir.1994). The plaintiff must also show that the statement complained of was false or misleading at the time it was made.*Id.* at 1548-49.

Plaintiff identifies each defendant by name and title. For each fax, email, or phone call at issue, plaintiffs alleges the date it occurred and who initiated the communication. For each communication, plaintiff includes the relevant representations or information communicated. Sec. Am. Compl. at ¶¶ 16 (Feb. 5, 2004 fax from Rothstein offering "broadcast faxing" services); 18 (February 2004 phone call from Rothstein agreeing to provide "blast fax" services and omitting information that such services were illegal); 20 (Mar. 5, 2004 email from Adams confirming agreement to buy blast fax services and representing "over 90% of users are happy with our services" which was knowingly false because Adams knew that Protus customers were unhappy with the blast fax services because they were illegal and had resulted in lawsuits

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)
**(Cite as: Not Reported in F.Supp.2d)**

against Protus customers); 21 (Mar. 5, 2004, Mar. 23, 2004, and Mar. 31, 2004 emails which Rothstein or Adams caused to be sent finalizing the billing for the blast fax services); 23 (Apr. 1, 2004 email from Maynard confirming blast fax campaign had been concluded).

*14 For the affirmative representation made by Adams that "[o]ver 90% of users are happy with our service[,]" plaintiff alleges that the statement was knowingly false. *Id.* at ¶ 20.For the other communications, plaintiff alleges that the "misrepresentation" was the omission that the blast fax services were illegal. *Id.* at ¶¶ 18, 21, 23, 28.

Based on these allegations, the Second Amended Complaint adequately alleges the time, place, and manner of each act of wire fraud, the relevant content of the communication or the relevant omission, and why it was misleading. Dismissal for failure to comply with Rule 9(b) is not warranted.

### CONCLUSION

I recommend that defendants' motions to dismiss (# 65, # 67), be denied.

### SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due February 1, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, a response to the objections is due February 15, 2006, and the review of the Findings and Recommendation will go under advisement on that date.

IT IS SO ORDERED.

MARSH, Judge.

### ORDER

On January 24, 2005, Magistrate Judge Hubel

issued a Findings and Recommendation that defendants' motions to dismiss plaintiff's second amended complaint for failure to state a claim (# 65 and # 67) should be denied. Defendants have filed timely objections and the matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b) on de *novo* review. *See*28 U.S.C. § 636(b)(1)(C); *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404, 1415 (9th Cir.1991).

Plaintiff asserts separate RICO claims based on 18 U.S.C. §§ 1962(c) and (d). He alleges defendants participated in a "massive fraud scheme ... to deceive innocent business owners throughout the U.S. into purchasing their 'blast fax' services (a 'blast fax' is a large number of unsolicited facsimile advertisements throughout the nation)." Pls' Second Amended complaint, ¶ 2.

Defendants moved to dismiss for failure to state a claim, asserting numerous shortcomings in plaintiff's pleading. Judge Hubel addressed all of the issues raised by defendants, applied the proper standard of review, and denied the motions.

Finding no error in the Findings and Recommendation (# 78), I adopt them as my own. Accordingly, the motions to dismiss of defendants Maynard and Adams (# 65) and defendant Thomas (# 67) are **DENIED.**

IT IS SO ORDERED.

D.Or.,2006.
The Flag Co. v. Maynard
Not Reported in F.Supp.2d, 2006 WL 1030173 (D.Or.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

418 F.Supp.2d 1142                                                                Page 1
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

▷
Hy Cite Corp. v. badbusinessbureau.com, L.L.C.
D.Ariz.,2005.

United States District Court,D. Arizona.
HY CITE CORPORATION, a Wisconsin corpora-
tion, Plaintiff,
v.
BADBUSINESSBUREAU.COM, L.L.C., a St.
Kitts/Nevis Corporation d/b/a badbusinessbur-
eau.com and/or ripoffreport.com and/or badbusi-
nessbureau.com/Rip-Off Report.com; Xcentric
Ventures, L.L.C., an Arizona limited liability com-
pany d/b/a badbusinessbureau.com and/or ripoffre-
port.com and/or badbusinessbureau.com/Rip-Off
Report.com; and Ed Magedson, an Arizona resid-
ent, Defendants.
**No. CIV.04-2856 PHX EHC.**

Dec. 27, 2005.

**Background:** Seller of dinnerware and cook-
ware brought action against operators of website
who allegedly posted false and defamatory con-
sumer complaints. Operators moved to dismiss.

**Holdings:** The District Court, Carroll, J., held
that:

(1) whether operators were entitled to im-
munity under the Communications Decency Act
(CDA) could not be determined on a motion to dis-
miss;

(2) plaintiff's allegations were sufficient to
state Racketeer Influenced and Corrupt Organiza-
tions Act (RICO) claim;

(3) criticism of plaintiff's business appearing
on website was not a competitive injury actionable
under the Lanham Act;

(4) plaintiff stated claim for common law un-
fair competition; and

(5) defendant could not be required to pay
plaintiff's costs and fees incurred as a result of de-
fendant's avoidance of service of process.

Ordered accordingly.

West Headnotes

**[1] Telecommunications 372 ☞1344**

372 Telecommunications
    372VIII Computer Communications
        372k1339 Civil Liabilities; Illegal or Improp-
er Purposes
            372k1344 k. Persons and Entities Liable;
Immunity. Most Cited Cases
Whether operators of website that allowed users to
post consumer complaints were entitled to im-
munity under the Communications Decency Act
(CDA) in connection with allegedly defamatory
complaints posted on the site could not be determ-
ined on a motion to dismiss, where wrongful con-
tent on the site allegedly included editorial com-
ments created by the operators and titles to com-
plaints that they allegedly provided. Communica-
tions Act of 1934, § 230(c), 47 U.S.C.A. § 230(c).

**[2] Extortion and Threats 165 ☞25.1**

165 Extortion and Threats
    165II Threats
        165k25 Nature and Elements of Offenses
            165k25.1 k. In General. Most Cited Cases
Obtaining property by threatening economic loss
can constitute extortion if the person making the
threat does not have a right to the property. 18
U.S.C.A. § 1951.

**[3] Extortion and Threats 165 ☞25.1**

165 Extortion and Threats
    165II Threats
        165k25 Nature and Elements of Offenses
            165k25.1 k. In General. Most Cited Cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

Dinnerware and cookware seller's allegations that operators of website solicited or created defamatory consumer complaints about it, then agreed to remove or modify those complaints only if paid a fee of $50,000 and a monthly retainer of $1,500 were sufficient to allege threatened extortion, as predicate act under Racketeer Influenced and Corrupt Organizations Act (RICO); remedying publication of false and defamatory complaints, which operators allegedly created and solicited, did not give them the right to collect fees. 18 U.S.C.A. §§ 1951, 1961(1)(A).

**[4] Telecommunications 372 ☞1014(8)**

372 Telecommunications
  372III Telephones
    372III(I) Offenses and Prosecutions
      372k1011 Offenses
        372k1014 Wire Fraud
          372k1014(8) k. Nature of Scheme or Device in General. Most Cited Cases
Dinnerware and cookware seller's allegations that website operators intentionally used their site as a scheme to obtain money from seller and other businesses by means of false and defamatory consumer complaints created and solicited by the operators, and that operators posted false and defamatory complaints and sent e-mails requesting that seller pay a $50,000 fee and $1,500 monthly retainer before they would take any action related to such materials were sufficient to allege wire fraud, as predicate act under Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. §§ 1343, 1961(1)(A).

**[5] Racketeer Influenced and Corrupt Organizations 319H ☞59**

319H Racketeer Influenced and Corrupt Organizations
  319HI Federal Regulation
    319HI(B) Civil Remedies and Proceedings
      319Hk56 Persons Entitled to Sue or Recover
        319Hk59 k. Business, Property, or Pro-

prietary Injury; Personal Injuries. Most Cited Cases
Injuries allegedly suffered by dinnerware and cookware seller when operators of website allegedly created or solicited false and defamatory consumer complaints about seller were actionable under Racketeer Influenced and Corrupt Organizations Act (RICO); seller alleged that it lost customers, that customers rescinded sales contracts, that its reputation was injured as a result of the contents of the website, and that users of the site expressly stated that they withheld business from seller after viewing the website. 18 U.S.C.A. § 1964(c).

**[6] Torts 379 ☞211**

379 Torts
  379III Tortious Interference
    379III(B) Business or Contractual Relations
      379III(B)1 In General
        379k211 k. Business Relations or Economic Advantage, in General. Most Cited Cases

**Torts 379 ☞212**

379 Torts
  379III Tortious Interference
    379III(B) Business or Contractual Relations
      379III(B)1 In General
        379k212 k. Contracts. Most Cited Cases
Interference with contractual relationships is actionable in Arizona, as is interference with a business relationship.

**[7] Trademarks 382T ☞1419**

382T Trademarks
  382TVIII Violations of Rights
    382TVIII(A) In General
      382Tk1418 Practices or Conduct Prohibited in General; Elements
        382Tk1419 k. In General. Most Cited Cases
To state a Lanham Act claim, Plaintiff must allege that it has suffered a competitive injury. Lanham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

Page 3

seq.

**[8] Antitrust and Trade Regulation 29T ⬅161**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(B) Particular Practices
            29Tk161 k. Representations, Assertions,
and Descriptions in General. Most Cited Cases
        (Formerly 382k422 Trade Regulation)
Making a false representation for a purpose other
than competition is not actionable under the Lan-
ham Act, otherwise the Lanham Act would create a
federal tort of misrepresentation. Lanham Trade-
Mark Act, § 1 et seq., 15 U.S.C.A. § 1051 et seq.

**[9] Antitrust and Trade Regulation 29T ⬅165**

29T Antitrust and Trade Regulation
    29TIII Statutory Unfair Trade Practices and
Consumer Protection
        29TIII(B) Particular Practices
            29Tk165 k. Representations Concerning
Others or Their Products; Disparagement. Most
Cited Cases
        (Formerly 382k425 Trade Regulation)
Criticism of dinnerware and cookware seller's busi-
ness appearing on website that posted consumer
complaints was not a competitive injury actionable
under the Lanham Act; no one would mistakenly
purchase cookware or dinnerware from site's oper-
ators in mistaken belief that it was seller's cook-
ware or dinnerware. Lanham Trade-Mark Act, § 1
et seq., 15 U.S.C.A. § 1051 et seq.

**[10] Antitrust and Trade Regulation 29T ⬅19**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(A) In General
            29Tk19 k. Representations, Assertions,
and Descriptions in General. Most Cited Cases
        (Formerly 382k422 Trade Regulation)
Common law unfair competition is broader than the
Lanham Act because the common law imposes liab-

ility for a false or misleading representation that is
to the likely commercial detriment of another. Lan-
ham Trade-Mark Act, § 1 et seq., 15 U.S.C.A. §
1051 et seq.; Restatement (Third) of Unfair Com-
petition § 2.

**[11] Antitrust and Trade Regulation 29T ⬅76**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(B) Actions and Proceedings
            29Tk74 Pleading
                29Tk76 k. Particular Cases. Most
Cited Cases
        (Formerly 382k564 Trade Regulation)
Dinnerware and cookware seller's allegations that
operators of website posted false and defamatory
statements which injured its business were suffi-
cient to state claim against the operators for com-
mon law unfair competition. Restatement (Third) of
Unfair Competition § 2.

**[12] Federal Civil Procedure 170A ⬅518**

170A Federal Civil Procedure
    170AIII Process
        170AIII(B) Service
            170AIII(B)5 Return and Proof of Service
                170Ak518 k. Failure to Make. Most
Cited Cases
Defendant could not be required to pay plaintiff's
costs and fees incurred as a result of defendant's
avoidance of service of process, where plaintiff
failed to mail a waiver of service to defendant, des-
pite having defendant's post office box and last
known residential addresses. Fed.Rules
Civ.Proc.Rule 4(d), 28 U.S.C.A.

**[13] Federal Civil Procedure 170A ⬅928**

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(I) Motions in General
            170Ak928 k. Determination. Most Cited
Cases
Motion for reconsideration should not be granted,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

Page 4

absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.

**Trademarks 382T ☞1800**

382T Trademarks
   382TXI Trademarks and Trade Names Adjudicated
      382Tk1800  k. Alphabetical Listing. Most Cited Cases
Royal Prestige.

**\*1144** Donald Wayne Bivens, Bivens & Nore, P.A., Michael Kent Dana, Bivens & Nore P.A., Phoenix, AZ, Brian J Rybarik, Kevin M. St. John, Michael Best & Friedrich LLP, John C Scheller, Michael Best & Friedrich LLP, Madison, WI, for Plaintiff.
Maria Crimi Speth, Jaburg & Wilk PC, Phoenix, for Badbusinessbureau.com, LLC, Xcentric Ventures, LLC, Ed Magedson, Defendants.

**ORDER**

CARROLL, District Judge.
   Defendant Xcentric Ventures, L.L.C. filed a Motion to Dismiss. [Dkt. 19]. Defendant Ed Magedson filed a Motion to Dismiss [Dkt. 38]. Those Motions are fully briefed.

   Defendants Ed Magedson and Xcentric Ventures filed a Motion for Partial Reconsideration. [Dkt. 25]. Pursuant to the Court's Order [Dkt. 26], Plaintiff filed a Response [Dkt. 31] and Defendants filed a Reply [Dkt. 34].

*Facts Alleged in Plaintiff's Amended Complaint*

   Defendant Ed Magedson manages Defendant Xcentric Ventures (Defendants). Defendants operate a website known as **\*1145** the Rip-off Report.FN1 The website proclaims itself as "a worldwide consumer reporting Website & Publication, by consumers, for consumers, to file & document complaints about Companies or Individuals

who ripoff consumers." [Dkt. 7, ex. A, p. 1]. The website claims to contain reports on "over 1,000 different Topics & Categories." [Dkt. 7, ex. A, p. 1]. The website allows users to post and view complaints, so called "Rip-off Reports," about businesses. Website users may also post comments or suggestions on complaints other users have posted. The website instructs its users that complaints may be used as negotiating tools with businesses. Specifically, the website states that a user may file a Rip-off Report detailing a complaint with a business, provide the business with notice of the Rip-off Report and advise the business that the user will update the Rip-off Report to include positive information about the business if the business resolves the user's complaint. [Dkt. 7, ex. A, p. 4]. The website states that media attention may follow the filing of a Rip-off Report. The website gives lawyers and potential plaintiffs instructions concerning how to use the information on the website to organize and file class action lawsuits. [Dkt. 7, ex. A, pp. 2, 4-5].

      FN1. The Rip-Off Report website is located at the domain names www.ripoffreport.com and www.badbusinessbur eau.com.

   Defendants encourage users who want to do more than simply post complaints to become "Rip-off Reporters." A Rip-off Reporter answers the public's "need [for] heroes and heroines, who w[ill] expose bad business and get them to clean up their act." [Dkt. 7, ex. C, p. 1]. Defendants outline the questions a Rip-off Reporter should investigate, and invite Rip-off Reporters to contact Defendants with questions about investigating businesses. Rip-off Reporters are also encouraged to provide their names when posting on the website, which is otherwise done anonymously. Rip-off Reporters are not normally compensated, but according to Defendants' website "once we see your work over a period of time, we fee (sic) [words missing in original] honest and dedicated, and depending on the region you're in you will be considered for compensation."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
(Cite as: 418 F.Supp.2d 1142)

Page 5

[Dkt. 7, ex. C, p. 2]. The website includes a tab containing information for those who wish to volunteer for the Rip-off Report.

According to Plaintiff's Amended Complaint, Defendants contribute material to the website. [Dkt. 7, pp. 6-7]. Defendants "produce original content contained in the Rip-Off Reports." [FN2] [Dkt. 7, p. 6]. Defendants produce editorials and create titles to the Rip-off Reports posted by users of the website. Defendants exercise editorial control over the website. Defendants use the website to solicit donations and sell the book, "Rip-Off Report.com Do-It-Yourself Guide: How to get Rip-off Revenge."

> FN2. Plaintiff does not describe specifically what original content Defendants produced. The exhibits attached to the Amended Complaint contain an Internet posting claiming that Defendant Magedson posted a complaint on the Rip-off Report website using another person's name and address. [Dkt. 7, ex. K, p. 4].

Plaintiff sells dinnerware and cookware under the trademarked name "Royal Prestige." On November 17, 2004, the Rip-off Report website included 35 Rip-off Reports involving Royal Prestige. Those reports detail various complaints about Plaintiff's business, including their sales tactics, misleading promotional offers, the quality of the dinnerware and cookware, and Plaintiff's refusal to abide by the terms of its sales contracts. [Dkt. 7, ex. G]. Plaintiff alleges that those reports contain "negative, false, misleading, and defamatory statements." For example, the website contains the statements: "Royal **1146** PrestigeHy-Cite (sic) Liars, Thieves, Criminals;""Hy-Cite (sic) was fined by several AGS around the country for their former scare tactics of telling people they would DIE if they cooked in any other cookware;""Royal Prestige ripoff Contract is not valid for cancellation (sic)... I realized this was a crooked company;" and "Royal PrestigeHy Cite Corporation ripoff and deceitful sales tactics." [Dkt. 7, p. 11].

Concerned with the complaints and statements appearing on the Rip-off Report website, Plaintiff, through counsel, sent letters to the website on April 16, 2003 and April 30, 2003, informing Defendants that they were publishing defamatory material and misusing Plaintiff's trademark. [Dkt. 7, p. 11]. On April 17, 2003 and May 28, 2003, Defendants' website, through counsel, responded in letters, directing Plaintiff to a mediation "program by which it has assisted several companies in resolving complaints and has posted reports on the website praising the companies for their cooperation and excellent customer service." [Dkt. 7, ex. I, p. 1]. The letter instructed Plaintiff that if it was interested in the program, it should send a e-mail to the editor of the Rip-off Report website. Plaintiff did so.

On July 11, 2003, after Plaintiff and Defendant Magedson had exchanged a series of e-mails, Defendant Magedson described the mediation program and its cost. Under the program, Defendants would e-mail "all the consumers who feel they were victimized, stating that they will get a full refund plus a min[imum] of 5% more for their inconvenience explaining (something to the effect of) management did not realize this was going on, and they are glad (as we discussed by phone) that these Rip-Off Reports were there to let them know of the problems." [Dkt. 7, ex. J, p. 1 (parenthetical statements in original) ]. Once a user's complaint reported in a Rip-off Report was resolved, Defendants would update the Rip-off Report and its title to show the complaint was resolved. If a user did not respond to Defendants' e-mail, Defendants would update the Report to "reflect Hy Cites (sic) willingness to satisfy this customer, but apparently they either filed a bogus Report, or they are a disgruntled employee, a competitor (sic) etc, what ever (sic) our findings, with some assistance from you, as to the possibilities of why they did not respond, the Report will reflect that and will definitely put you in a good light" [Dkt. 7, ex. J, p. 2]. Defendants would add to each Rip-off Report a link to a statement, written by Plaintiff, explaining the steps it took to resolve the complaint.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
(Cite as: 418 F.Supp.2d 1142)

Page 6

Before Defendants would e-mail the users who filed Rip-off Reports, Plaintiff would have to send a $30,000 check. Plaintiff would also have to provide Defendants with a statement explaining the reasons for the complaints. Defendants would then "evaluate your statement, to see if we can work with it to make this program work." [Dkt. 7, ex. J, p. 2]. Once all the Reports were updated, Plaintiff would be required to provide another $20,000. Thereafter, Plaintiff would be required to pay a $1,500 monthly retainer, in exchange for Defendant notifying Plaintiff of any complaints, as long as there were no more than four per month, and giving Plaintiff an opportunity to resolve the complaints before allowing any new Rip-off Reports against Plaintiff to be posted. [Dkt. 7, ex. J, p. 3].

### Procedural History

On January 18, 2005, Plaintiff filed an Amended Complaint, alleging ten counts. [Dkt. 7]. The Amended Complaint names badbusinessbur-eau.com, L.L.C., Xcentric Ventures, L.L.C. and Ed Magedson as Defendants. The docket indicates that badbusinessbureau, L.L.C. has not been **1147 served and has not entered an appearance in this case.

On March 13, 2005, Plaintiff filed a Motion for Alternative Service on Defendant Magedson. [Dkt. 13]. Plaintiff alleged that it had unsuccessfully attempted to serve Defendant Magedson at his last known residence and had watched his post office box from February 16, 2005 to March 9, 2005, but had not seen Defendant Magedson. Plaintiff did not allege that it had sent a waiver of service request to Defendant Magedson's residence or his post office box. On April 19, 2005, the Court ordered Defense Counsel to accept service on Defendant Magedson's behalf and ordered Defendant Magedson to pay Plaintiff's costs incurred as a result of his avoidance of service. [Dkt. 24]. Defendant Magedson has been served [Dkt. 32], as has Defendant Xcentric Ventures [Dkt. 27].

### Motions to Dismiss

Defendants Xcentric Ventures [Dkt. 19] and Magedson [Dkt. 38] filed Motions to Dismiss. Those Motions to Dismiss are entirely identical, with the exceptions that Defendant Magedson's Motion adds an argument that Plaintiff does not adequately plead wire fraud and discusses a recent Ninth Circuit decision, *Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672 (9th Cir.2005). Defendant Xcentric Ventures filed a Notice of Supplemental Authority regarding *Bosley Medical.* [Dkt. 20]. The Court, therefore, will consider the Motions togeth- er.

### Legal Standard

A court may dismiss a complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citation omitted). All material allegations of the complaint must be accepted as true and in a light most favorable to Plaintiff. *In re Broderbund/Learning Co. Securities Litigation,* 294 F.3d 1201, 1203 (9th Cir.2002).

### A. Immunity Pursuant to the Communications Decency Act

[1] Defendants argue that Counts Three through Eight and Count Ten of Plaintiff's Amended Complaint are barred by the Communications Decency Act (CDA), 47 U.S.C. § 230. The CDA provides that "no provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The phrase "interactive computer service is defined as 'any information service, system, or access software provider that provides or enables computer access to the Internet and such systems operated or services offered by libraries or educational institutions.' " 47 U.S.C. § 230(f)(2). The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
(Cite as: 418 F.Supp.2d 1142)

phrase "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

In enacting the CDA, "Congress granted most Internet services immunity from liability for publishing false or defamatory material so long as the information was provided by another party. As a result, Internet publishers are treated differently from corresponding publishers in print, television and radio." *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1122 (9th Cir.2003). Congress found Internet services and publishers deserving of this favorable treatment because the Internet has flourished "with a minimum of government regulation," and has become "a forum for a true diversity of political discourse, unique opportunities for cultural **\*1148** development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(4) & (5).

Based on Congress' findings, "reviewing courts have treated § 230(c) immunity as quite robust." FN3 *Carafano,* 339 F.3d at 1123 (citing cases). The Ninth Circuit has issued two decisions addressing claims of § 230(c) immunity. Both of those cases turned on whether the defendants were "information content providers" of the allegedly wrongful content posted on their websites.

> FN3. A commentator has argued that § 230(c) immunity should be narrowly construed because in enacting the CDA Congress did not consider the potential harms to the subjects of false or defamatory material posted on the Internet. Susan Freiwald, *Comparative Institutional Analysis in Cyberspace; The Case of Intermediary Liability for Defamation,* 14 Harv. J.L. & Tech. 569, 631-42 (2001).

In *Carafano,* the Court held that the defendant, a computer match-making service, was immune from liability for false content in a dating profile

posted on the defendant's website because the critical information was provided by a third party and the defendant transmitted the information without alteration. 339 F.3d at 1125. The information given in the dating profile was formulated in response to the defendant's questionnaire, which the defendant used to gather standardized information for the dating profiles it posted on its website. The Court concluded that soliciting data through a questionnaire did not constitute "a significant role in creating, developing or 'transforming' the relevant information." *Ibid.*

In another case, the Court considered whether § 230(c) immunity applied to the defendant operator of an electronic newsletter who published in the newsletter an allegedly defamatory e-mail sent to him by a third party. *Batzel v. Smith,* 333 F.3d 1018, 1021 (9th Cir.2003). In that case, the Court found that the defendant's website and electronic newsletter fit "the broad statutory definition of 'interactive computer service.' " *Id.,* 333 F.3d at 1030. The Court stated that "the pertinent question is whether [the third party] was the sole content provider of his e-mail, or whether [the defendant] can also be considered to have "creat[ed]" or "develop[ed]" [the third party's] e-mail message." *Id.,* 333 F.3d at 1031. The Court found that the defendant was not a content provider because he "did no more than select and make minor alterations to [the third party's] e-mail." *Ibid.* The Court, however, remanded the case to determine whether the allegedly defamatory e-mail was "provided by another information content provider" because the sender of the e-mail maintained that he did not send the e-mail intending it for publication on the Internet. *Id.,* 333 F.3d at 1032.

Turning to this case, Defendants are alleged to be "provider[s]... of an interactive computer service." *See* 47 U.S.C. § 230(c). Plaintiff alleges that Defendants operate a website known as the Rip-off Report and that persons using the Internet have access to the website. *See* 47 U.S.C. § 230(f)(2). Persons accessing the website may view so-called Rip-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

off Reports, make comments on those Reports, or post their own Rip-off Reports. As in *Carafano* and *Batzel,* the pertinent question is whether users posting on Defendants' website are the sole providers of the allegedly wrongful content, or whether Defendants can be considered to have created or developed any of the allegedly wrongful content posted on the Rip-off Report website.

Defendants argue that they did not create or develop any of the allegedly wrongful content, although they provided other content on the Rip-off Report website, because**\*1149** the allegedly wrongful content appears in Rip-off Reports authored by users accessing the website. This argument ignores Plaintiff's allegations that wrongful content appears on the Rip-off Report website in editorial comments created by Defendants and titles to Rip-off Reports, which Defendants allegedly create. Moreover, Plaintiffs allege that Defendants "produce original content contained in the Rip-off Reports." Plaintiffs further allege that Defendants "solicit individuals to submit reports with the promise that individuals may ultimately be compensated for their reports." These allegations arguably could support a finding that Defendants are "responsible... for the creation or development of information" provided by individuals submitting Rip-off Reports in response to Defendants' solicitation. *See*47 U.S.C. § 230(f)(3). Taking Plaintiff's allegations as true, *In re Broderbund,* 294 F.3d at 1203, Defendants are not entitled to immunity under the CDA at this stage of the case.

**B. Racketeer Influenced and Corrupt Organizations Act (RICO)**

Counts One and Two allege violations of RICO, which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Racketeering activ-

ity" includes extortion, both actual or threatened, and wire fraud. 18 U.S.C. § 1961(1)(A) & (B). To show a "pattern of racketeering activity" a plaintiff must show at least two racketeering acts. 18 U.S.C. § 1961(5), *Sedima v. Imrex Co.,* 473 U.S. 479, 496 n. 14 (1985) ("while two acts are necessary, they may noy be sufficient"). Simply stated, "RICO prohibits engaging in a pattern of 'racketeering activity,' defined as violating certain laws; as such, a predicate illegal act must be alleged." *Mendoza v. Zirkle Fruit Co.,* 301 F.3d 1163, 1168 (9th Cir.2002) (citation omitted). In this case, Plaintiff alleges threatened extortion and wire fraud.

**1. Predicate Acts: Threatened Extortion and Wire Fraud**

[2][3] In defining extortion, the RICO statute refers to 18 U.S.C. § 1951, which in subsection (b)(2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." Obtaining property by threatening economic loss can constitute extortion if the person making the threat does not have a right to the property. *See, e.g., United States v. Kattar,* 840 F.2d 118, 122-24 (1st Cir.1988) (threat to defame if money owed under a contract was not paid constituted extortion), *United States v. Cerilli,* 603 F.2d 415, 418-19 (3d Cir.1979) (grant of government contracts conditioned on making political contributions was extortion), *but see Rothman v. Vedder Park Mgmt.,* 912 F.2d 315, 318 (9th Cir.1990) (no extortion where defendants threatened to raise rent because, as landlords, they had a right to raise rent). Here, Defendants argue that Plaintiff does not properly allege threatened extortion because Defendants conduct, as alleged, is "nothing more than an offer to provide services for compensation;" and thus there is no allegation of a wrongful threat of economic loss. [Dkt. 38, p. 12].

In the Amended Complaint, Plaintiff alleges that Defendants solicit and create Rip-off Reports with "negative, misleading false, and defamatory

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

content." [Dkt. 7, p. 2]. Plaintiff further alleges that Defendants will only remove or modify those wrongful reports if paid a fee of $50,000 and a monthly retainer of $1,500. Stated **\*1150** in full, Plaintiff alleges that, after receiving a $30,000 check, Defendants would contact users who filed Rip-off Reports against Plaintiff with an offer that Plaintiff would refund their money paid to Plaintiff plus five percent. Defendants would then update the Rip-off Report and its title to show that the complaint was resolved. Plaintiff further alleges that if the author of a Rip-off Report did not respond to Defendant's e-mail, Defendants would update the Report to "reflect Hy Cites (sic) willingness to satisfy this customer, but apparently they either filed a bogus Report, or they are a disgruntled employee, a competitor (sic) etc, what ever (sic) our findings, with some assistance from you, as to the possibilities of why they did not respond, the Report will reflect that and will definitely put you in a good light" [Dkt. 7, ex. J, p. 2]. Plaintiff alleges that in exchange for the $30,000 check, Defendant would also include a link to a statement, written by Plaintiff, explaining the steps it took to resolve the complaint. Plaintiff alleges that it would be required to provide another $20,000 once all the Rip-off Reports against Plaintiff were updated. Plaintiff further alleges that Defendants would require Plaintiff to pay a $1,500 monthly retainer, in exchange for Defendant notifying Plaintiff of any new complaints and giving Plaintiff an opportunity to resolve the complaints before allowing any new Rip-off Reports against Plaintiff to be posted. [Dkt. 7, ex. J, p. 3]. Plaintiff alleges that Defendants have threatened other businesses with this scheme.

Those allegations of Defendants' conduct distinguishes this case from *Rothman.* There, the defendants owned and operated a mobile home park. As landlords, the defendants had the right to set the price of rent in the park. Because the defendants had the right to raise the rent, it was not unlawful for them to threaten raising the rent for tenants who refused to enter a lease agreement. *Id.,* 912 F.2d at 318. Here, Defendants operate a website. Plaintiff

alleges that Defendants create and solicit false and defamatory complaints against businesses, but will cease this conduct for a $50,000 fee and $1,500 monthly retainer. Remedying the publication of false and defamatory complaints, which Defendants allegedly created and solicited, does not give Defendants the right to collect fees. *See Kattar,* 840 F.2d at 122-24 (RICO claim allowed where the defendant threatened defamation if not paid money, even though the plaintiff owed the defendant money under a contract). Plaintiff has properly alleged threatened extortion.

[4] Plaintiff has also properly alleged wire fraud. Wire fraud occurs when a person "(1) devised or intending to devise any scheme or artifice... for obtaining money ... by means of false or fraudulent pretenses, representations or promises, (2) transmits or causes to be transmitted by means of wire... any writings... for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343 (numbers added). As discussed above, Plaintiff alleges that Defendants intentionally used their website as a scheme to obtain money from Plaintiff and other businesses by means of false and defamatory complaints created and solicited by Defendants. Plaintiff also alleges that Defendants posted false and defamatory complaints and sent e-mails requesting that Plaintiff pay a $50,000 fee and $1,500 monthly retainer before Defendants would take any action related to the materials on the website. Both posting complaints on the website and sending e-mails requires transmitting writings by means of wire. *See United States v. Pirello,* 255 F.3d 728, 729 (9th Cir.2001) (affirming sentence imposed after the defendant "pled guilty to using the Internet to commit wire fraud in violation of 18 U.S.C. § 1343").

**\*1151 2. Injury Actionable under RICO**

[5] RICO provides a civil action for "any person injured in his business or property by reason of" a pattern of racketeering activity. 18 U.S.C. § 1964(c). Defendants argue that Plaintiff has not al-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

Page 10

leged injury to business or property and that any injury alleged by Plaintiff was caused by users of Defendants' website, not by Defendants' alleged racketeering activity.

[6] Plaintiff alleges that it has lost customers, that customers have rescinded sales contracts, and that Plaintiff's reputation has been injured as a result of the contents of Defendants' website. Plaintiff further alleges that users of Defendants' website have expressly stated on the website that they withheld business from Plaintiff after viewing the website. That allegation distinguishes this case from *Imagineering Inc. v. Kiewit Pacific Co.,* 976 F.2d 1303, 1309-12 (9th Cir.1992), where the plaintiffs alleged only speculative injuries, having failed to allege any specific bids they lost due to the defendants' racketeering activity. In determining whether an injury is to "business or property" as used in 18 U.S.C. § 1964(c), the Court will look to state law. *See Diaz v. Gates,* 420 F.3d 897, 899 (9th Cir.2005) (en banc) (in the RICO context, "we typically look to state law to determine whether a particular interest amounts to property"(quotation omitted)). Interference with contractual relationships is actionable in Arizona, *Safeway Ins. Co. v. Guerrero,* 106 P.3d 1020, 1025, 210 Ariz. 5 (2005) (insurance company did not have a claim for interference with contract against attorney representing an opposing party in other litigation), as is interference with a business relationship, *Antwerp Diamond Exch. v. Better Business Bureau,* 637 P.2d 733, 740, 130 Ariz. 523, 529 (1981)(disapproved on unrelated grounds in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 753, n. 1, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)) ("dampening sales or other business transaction" was cognizable injury). Damage to reputation is compensable under those causes of action. RESTATEMENT (SECOND) OF TORTS, § 774A(1)(c) (1979). As alleged, Plaintiff's injuries are to their "business or property."

Plaintiff's injuries, as alleged, were caused by Defendants racketeering activity. Plaintiff alleges

that Defendant intentionally used its website as a scheme to obtain money from Plaintiff and other businesses. Plaintiff alleges that Defendants did so by creating and soliciting content injurious to Plaintiff's business and offering to alter the content to portray Plaintiff in a good light if Plaintiff payed a $50,000 fee and $1,500 monthly retainer.

**C. The Lanham Act**

[7][8][9] The Lanham Act, 15 U.S.C. §§ 1051 et seq., "is designed to protect consumers who have formed particular associations with a mark from buying a competing product using the same or substantially similar mark and to allow the mark holder to distinguish his product from that of his rivals." *Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 676 (9th Cir.2005). To state a Lanham Act claim, Plaintiff must allege that it has suffered a competitive injury. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 734 (9th Cir.1999) (seeking to divert business from plaintiff to defendant was competitive injury alleged to support false advertising claim). In contradistinction, making a false representation for a purpose other than competition is not actionable under the Lanham Act, otherwise the Lanham Act would create a federal tort of misrepresentation. *Bosley Medical,* 403 F.3d at 679-80 (no Lanham Act claim because defendant's "use of the [plaintiff's] *1152 mark simply cannot mislead consumers into buying a competing product"), *Halicki v. United Artists Communications, Inc.,* 812 F.2d 1213, 1214 (9th Cir.1987) (no Lanham Act claim for false advertising where movie theaters advertised a movie rated R although it was actually rated PG).

In this case, Plaintiff alleges that the statements on Defendants' website concerning Plaintiff's dinnerware, cookware, and business practices constitute unfair competition, false advertising and disparagement (Counts Six through Eight) in violation of the Lanham Act. Plaintiff alleges that it suffered a competitive injury because those statements "are used to promote goods and services sold by De-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
(Cite as: 418 F.Supp.2d 1142)

fendants." [Dkt. 7, p. 23]. The only goods of Defendants mentioned in the Amended Complaint are Defendants' book, "Rip-Off Report.com Do-It-Yourself Guide: How to get Rip-off Revenge." [Dkt. 7, p. 6]. The only services mentioned in the Amended Complaint are the mediation program where Defendants update the content of the Rip-Off Reports to portray businesses in a good light which Plaintiff alleges is an extortionate scheme. [Dkt. 7, p. 15].

The situation Plaintiff alleges differs from *Coastal Abstract,* 173 F.3d at 734, because Plaintiff's business selling dinnerware and cookware cannot be diverted to Defendants, whose business is criticizing other businesses. In *Coastal Abstract,* an officer of the defendant title company argued that he could not be liable "under the Lanham Act because he, as an individual, is not in competition with [the plaintiff] Coastal," an escrow agency. *Ibid.* The Court found the defendant corporation's officer could be liable under the Lanham Act because he "sought by his statements to divert business from [the plaintiff] Coastal to [the defendant] First American," thereby causing plaintiff a competitive injury. *Ibid.* In this case, Plaintiff's injuries as a result of Defendants' website are not competitive injuries because sales of dinnerware and cookware cannot be diverted to sales of Defendants' book or remediation program.

The situation alleged in this case is akin to that presented in *Bosley Medical,* 403 F.3d at 674, where the defendant created a website to publicize his complaints about the plaintiff's business and to strengthen his negotiating position with the plaintiff. The plaintiff in that case argued that its allegations of extortion and preventing "users from obtaining the plaintiff's goods and services" sufficed under the Lanham Act. *Id.,* 403 F.3d at 678-79. The Court held that the defendant's activities did not constitute actionable conduct under the Lanham Act. Although Plaintiff in this case alleges Lanham Act claims for unfair competition, false advertising and disparagement, while *Bosley Medical*

involved Lanham Act claims for trademark infringement and dilution, the holding in *Bosley Medical* was not based on the particularities of those claims, but on the purposes of the Lanham Act. The Court stated:

The dangers that the Lanham Act was designed to address are simply not at issue in this case. The Lanham Act, expressly enacted to be applied in commercial contexts, does not prohibit all unauthorized uses of a trademark. [The defendant] Kremer's use of the [plaintiff's] Bosley Medical mark simply cannot mislead consumers into buying a competing product-no customer will mistakenly purchase a hair replacement service from Kremer under the belief that the service is being offered by [the plaintiff] Bosley. Neither is Kremer capitalizing on the good will Bosley has created in its mark. Any harm to Bosley arises not from a competitor's sale of a similar product under Bosley's mark, but from Kremer's criticism of their services.*1153 Bosley cannot use the Lanham Act either as a shield from Kremer's criticism, or as a sword to shut Kremer up.

*Id.,* 403 F.3d at 679-80. Similarly, in this case no one will mistakenly purchase cookware or dinnerware from Defendants in the mistaken belief that it is Plaintiff's cookware or dinnerware. The criticism of Plaintiff's business appearing on Defendants' website is not a competitive injury actionable under the Lanham Act.

**D. Common Law Trademark Infringement and Unfair Competition**

[10][11] Defendants argue that Count Nine alleging common law trademark infringement and unfair competition must be dismissed because Plaintiff has not alleged that the appearance of Plaintiff's mark on Defendants' website is likely to cause confusion as to Plaintiff's relationship with the website. The "likelihood of confusion" standard is found in the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and in common law unfair competition, *see*RESTATEMENT (THIRD) OF UNFAIR

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

COMPETITION, § 2 (1995) ("likely to deceive or mislead"). Common law unfair competition, however, is broader than the Lanham Act because the common law imposes liability for a false or misleading representation that "is to the likely commercial detriment of another." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 2. As previously mentioned, the Amended Complaint alleges that Defendants' website contains false and defamatory statements which have injured Plaintiff's business. Plaintiff has alleged common law unfair competition.

### Motion for Partial Reconsideration

[12] On April 19, 2005, the Court ordered alternative service on Defendant Magedson and ordered that "Defendant Magedson shall pay Plaintiff all costs and fees incurred as a result of Defendant Magedson's avoidance of Service of Process." [Dkt. 24, p. 2]. Defendants filed a Motion for Partial Reconsideration [Dkt. 25] of the portion of the Order requiring Defendant Magedson to pay Plaintiff's costs and fees.

[13] "[A] motion for reconsideration should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *389 Orange Street Partners v. Arnold,* 179 F.3d 656, 665 (9th Cir.1999) (no clear error where district court did not redesignate a cross-claim as an affirmative defense because party did not raise the issue until after grant of summary judgment).

Defendants argue that Defendant Magedson should not be required to pay Plaintiff's costs and fees incurred as a result of his avoidance of service of process because Plaintiff did not send him a waiver of service pursuant to Fed.R.Civ.P. 4(d). The Federal Rules of Civil Procedure impose a duty on certain defendants "to avoid unnecessary costs of serving the summons." Fed.R.Civ.P. 4(d)(2). That duty is only imposed on a defendant "that re-

ceives notice of an action in the manner provided in this paragraph," which is by mailing a notice of the action and a "request that the defendant waive service of a summons." *Ibid.* If a defendant fails to waive the service of a summons, "the court shall impose the costs subsequently incurred in effecting service on the defendant unless good cause for the failure be shown." Fed.R.Civ.P. 4(d).

Plaintiff does not argue that Defendant Magedson failed to waive the service of a summons and that Plaintiff was awarded its costs and fees based on the failure to waive service. Plaintiff argues the Court properly required Defendant Magedson to **\*1154** pay its costs and fees as an exercise of the Court's inherent power to sanction parties to litigation. Plaintiff further argues a sanction is proper in this case because Defendant Magedson avoided service of process, indicating that a request for waiver of service would have been futile.

Plaintiff fails to point to any authority- and the Court can find no authority for the proposition that the alleged futility of requesting a waiver of service justifies shifting the costs and fees of the service of process. Neither is there any reason Plaintiff could not have mailed a waiver of service request to Defendant Magedson. Plaintiff had Defendant Magedson's post office box address, a proper address for sending a waiver of service request. *Compare*Fed.R.Civ.P. 4(d)(2)(A) (waiver of service request "shall be addressed directly to the defendant") *with*Fed.R.Civ.P. 4(e)(2) (summons and complaint shall be served personally or "at the individual's dwelling house or usual place of abode"). Plaintiff had Defendant Magedson's last known residential address. [Dkt. 17]. Defendant Magedson represented that residential address on his application for a post office box, which requires him to immediately update his residential address upon a change. Plaintiff mailed the Summons, Complaint, and Court Order authorizing alternative service to that residential address in satisfaction of Ariz. R. Civ. P. 4.1(m) (allowing alternative service, but requiring summons and pleading to be sent to last

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

418 F.Supp.2d 1142
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992
**(Cite as: 418 F.Supp.2d 1142)**

Page 13

known residence of the person to be served). Because Plaintiff did not mail a waiver of service to Defendant Magedson as required under Fed.R.Civ.P. 4(d), it was clear error to require Defendant Magedson to pay Plaintiff's costs and fees incurred as a result of Defendant Magedson's avoidance of service of process.

Accordingly,

**IT IS ORDERED** that Defendant Xcentric Ventures, L.L.C.'s Motion to Dismiss [Dkt. 19] is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that Defendant Ed Magedson's Motion to Dismiss [Dkt. 38] is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that Counts Six, Seven and Eight of Plaintiff's Amended Complaint are **DISMISSED** for failure to state a claim upon which relief can be granted.

**IT IS FURTHER ORDERED** that Defendant's Motion for Partial Reconsideration [Dkt. 25] is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Ed Magedson shall not be required to pay Plaintiff all costs and fees incurred as a result of Defendant Ed Magedson's avoidance of Service of Process.

D.Ariz.,2005.
Hy Cite Corp. v. badbusinessbureau.com, L.L.C.
418 F.Supp.2d 1142, RICO Bus.Disp.Guide 10,992

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2067072 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

C
Ruiz v. Decision One Mortg. Co., LLC
N.D.Cal.,2006.
Only the Westlaw citation is currently avail-
able.NOT FOR CITATION
        United States District Court, N.D. California,
                    San Jose Division.
          Jose RUIZ and Georgina Ruiz, Plaintiffs,
                            v.
    DECISION ONE MORTGAGE COMPANY, LLC;
       American Mutual Financial Services; Johnny
      Hwang; Ashish Oberoi; Imran Nasir; Andrew Mi-
      chael Oldham; Anita Siu Yee Cheung, Defendants.
                 No. C06-02530 HRL.

                      July 25, 2006.

Cindy Hamilton, Karen Rosenthal, William J.
Goines, Greenberg Traurig, LLP, East Palo Alto,
CA, Kerstin Arusha, Stephanie Sidra Alexandre
Stevens, Fair Housing Law Project, San Jose, CA,
for Plaintiffs.
Sharon Cohen Collier, Walnut Creek, CA, Joseph
C. Campo, Lewis Brisbois Bisgaard & Smith LLP,
San Francisco, CA, for Defendants.

   **ORDER (1) GRANTING DECISION ONE
   MORTGAGE'S MOTION TO STRIKE POR-
   TIONS OF THE COMPLAINT; AND (2)
   GRANTING IN PART AND DENYING IN
   PART DECISION ONE MORTGAGE'S MO-
   TION TO DISMISS CLAIMS SEVEN AND
         EIGHT OF THE COMPLAINT**

HOWARD R. LLOYD, Judge.
   *1 On July 25, 2006, this court heard the
"Motion to Strike Portions of the Complaint" and
"Motion to Dismiss Claims Seven and Eight of the
Complaint" filed by defendant Decision One Mort-
gage Company ("Decision One"). Upon considera-
tion of the moving and responding papers filed by
the parties, as well as the arguments of counsel, this
court (1) grants Decision One's motion to strike as
unopposed; and (2) grants in part and denies in part

Decision One's motion to dismiss.[FN1]

   FN1. Pursuant to 28 U.S.C. § 636(c) and
   Fed.R.Civ.P. 73, all parties have expressly
   consented that all proceedings in this mat-
   ter may be heard and finally adjudicated by
   the undersigned.

                  I. BACKGROUND

   This is a civil action which arises from defend-
ants' alleged predatory lending practices for which
plaintiffs seek damages, as well as declaratory and
injunctive relief. According to the complaint,
plaintiff Jose Ruiz is primarily a Spanish speaker,
with limited ability to speak, read or write in the
English language. His wife, plaintiff Georgina
Ruiz, speaks only Spanish. Plaintiffs claim that
they are the victims of defendants' "abusive and
predatory" lending practices in connection with the
refinancing of their home mortgage. Among other
things, they claim that defendants misrepresented
essential loan terms, used bait and switch tactics,
charged unreasonable, unearned and duplicative
fees, and failed to translate loan documents from
English into Spanish. They assert that defendants
have violated several federal and state laws, and the
complaint alleges eleven claims for relief: (1) viola-
tion of the Real Estate and Settlement Procedures
Act, 12 U.S.C. § 2607(a), et seq. and Federal Re-
serve Regulation X, 24 C.F.R. § 3500et seq.; (2) vi-
olation of the Fair Housing Amendments Act, 42
U.S.C. § 3601et seq.; (3) violation of the Fair Em-
ployment and Housing Act, Cal. Govt.Code §
12955et seq.; (4) fraud; (5) violation of the Unfair
Competition Act, Cal. Bus. & Prof.Code § 17200et
seq.; (6) breach of fiduciary duty; (7) professional
negligence; (8) violation of California Civil Code §
1632; (9) rescission/cancellation; (10) violation of
the Equal Credit Opportunity Act, 15 U.S.C. §
1691et seq.; and (11) notary malfeasance.

   Presently before this court are two motions
filed by defendant Decision One. First, Decision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2067072 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

One moves to strike portions of the complaint on the ground that amendments brought about by the passage of Proposition 64 preclude plaintiffs from suing on behalf of the general public or from seeking attorney's fees under California's Unfair Competition Laws. Second, pursuant to Fed.R.Civ.P. 12(b)(6), Decision One moves to dismiss the seventh and eighth claims for relief for professional negligence and for violation of California Civil Code section 1632. It contends that the complaint does not allege sufficient facts establishing that it owed plaintiffs a duty of care. Decision One also asserts that California Civil Code section 1632 does not cover the loan at issue. It further contends that, because Decision One is not a real estate broker, California Civil Code section 1632 does not apply in any event.

## II. LEGAL STANDARD

*2 A motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) tests the legal sufficiency of the claims in the complaint. In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *See Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990). "However, the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."*Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir.1994). Dismissal is appropriate only when it " 'appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Balistreri,* 901 F.2d at 699 (quoting *Conley v. Gibson,* 355 U .S. 41, 45-46 (1957)). Ordinarily, a court may only look at the face of the complaint and documents attached to the complaint in deciding a Fed.R.Civ.P. 12(b)(6) motion to dismiss. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1555 n .19 (9th Cir.1990).

## III. DISCUSSION

### A. *Motion to Strike Portions of the Complaint*

Decision One moves to strike those portions of the complaint in which plaintiffs purport to seek relief "on behalf of the general public" and claim entitlement to the recovery of attorney's fees pursuant to California's Unfair Competition Laws. The court may strike "from any pleading any insufficient defense, or any redundant, immaterial, impertinent, or scandalous matter."FED.R .CIV.P. 12(f). Here, Decision One argues that amendments to California's Unfair Competition Laws, brought about by the passage of Proposition 64 in 2004, bar plaintiffs from suing on behalf of the general public or from seeking the recovery of attorney's fees. Plaintiffs state that they do not oppose Decision One's motion to strike. Accordingly, the motion is granted.

### A. *Motion to Dismiss Claims Seven and Eight of the Complaint*

#### 1. *Seventh Claim for Relief: Professional Negligence*

Plaintiffs assert their claim for professional negligence against nearly all defendants, including Decision One. They allege that Decision One, as the mortgage loan lender, is liable because it "acted negligently in failing to properly consider, investigate, evaluate or audit plaintiffs' loan application and/or ability to repay loans."(Complaint, ¶ 118). Additionally, they allege that "[d]efendants owed plaintiffs a duty to act with that degree of skill, prudence and diligence as other mortgage brokers and lenders of ordinary skill and capacity in the performance of the services they undertake."(*Id.,* ¶ 116). Further, the complaint alleges that "[d]efendants knew or should have known to utilize the best practices for underwriting, originating and issuing loans when considering the Decision [One] loans to plaintiffs but negligently failed to do so."(*Id.,* ¶ 120).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2067072 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

**\*3** Decision One moves to dismiss this claim, arguing that it owed no duty of care to plaintiffs in its capacity as the mortgage lender. In California, generally, there is no duty of care owed to a borrower by a lender. *See Nymark v. Heart Federal Savings & Loan Ass'n,* 231 Cal.App.3d 1089, 283 Cal.Rptr. 53, 56 (1991) ("[A]s a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money.")."Liability to a borrower for negligence arises only when the lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender.' " *Wagner v. Benson,* 101 Cal.App.3d 27, 161 Cal.Rptr. 516, 521 (1980) (citing *Connor v. Great Western Savings & Loan Ass'n,* 69 Cal.2d 850, 73 Cal.Rptr. 369 (1968); *Bradler v. Craig,* 274 Cal.App.2d 466, 79 Cal.Rptr. 401 (1969); *Kinner v. World Savings & Loan Ass'n,* 57 Cal.App.3d 724, 129 Cal.Rptr. 400 (1976)).

Plaintiffs argue that *Nymark* and *Wagner* are factually distinguishable and that their holdings should be limited to the particular facts of each case. In *Nymark,* the court concluded that the lender owed no duty to the borrower in the preparation of its property appraisal in connection with its loan approval process. *Nymark,* 283 Cal.Rptr. at 59. In *Wagner,* the court found that the lender owed no duty of care to the borrowers with respect to the prosperity of a financial investment that the borrowers made with the borrowed funds. *Wagner,* 161 Cal.Rptr. at 521. Further, plaintiffs contend that both *Nymark* and *Wagner* cite *Connor v. Great Western Savings & Loan Ass'n,* 69 Cal.2d 850, 73 Cal.Rptr. 369 (1968), which concerned whether a duty was owed to third parties not in privity of contract with the lender. Nevertheless, as noted above, both *Nymark* and *Wagner* recognize the general rule that no duty of care is owed by a lender to a borrower. Here, the complaint contains no allegations indicating that Decision One acted beyond the scope of its conventional activities as a lender of money. Nor do plaintiffs indicate that the defi-

ciency may be cured by amendment.

Plaintiffs nonetheless argue that the loan at issue in *Wagner* was commercial, whereas the loan at issue in the instant action is residential. They assert that "extensive regulation and consumer protections" pertaining to residential loans-namely, the Truth in Lending Act, the Real Estate and Settlement Procedures Act, the Home Ownership and Equity Protection Act, California Civil Code § 1632, and California Financial Code § 4970*et seq.*-give rise to a lender's duty of care to a borrower for residential loans, even if no such duty would arise in the commercial context. However, plaintiffs have not cited any authority to support this proposition.

Plaintiffs contend that a lender may be held liable in negligence to a borrower, citing *Washington Mutual Bank v.Super. Ct.,* 75 Cal.App.4th 773, 89 Cal.Rptr.2d 560 (1999) and *Wanger v. EMC Mortgage Corp.,* 103 Cal.App.4th 1125, 127 Cal.Rptr.2d 685 (2002). However, neither case addressed the existence of a duty between a lender and a borrower. In *Washington Mutual Bank,* the court addressed a preemption issue and held that state law claims based on the violation of Real Estate and Settlement Procedures Act requirements and related regulations are not expressly preempted by federal law. *Washington Mutual Bank,* 89 Cal.Rptr.2d at 571. In *Wanger,* the court reversed summary judgment in favor of a lender, finding that there were material issues of fact as to the borrower's claim that the notice of transfer requirement under the Real Estate and Settlement Procedures Act had been violated. *Wanger,* 127 Cal.Rptr.2d at 690, 694-95.

**\*4** This court concludes that plaintiffs have not alleged that Decision One owed them a duty establishing direct liability. Nevertheless, it agrees that plaintiffs have, for purposes of a Fed.R.Civ.P. 12(b)(6) motion to dismiss, sufficiently alleged an agency relationship between Decision One and the defendant mortgage loan broker. Here, plaintiffs cite *Montoya v. McLeod,* 176 Cal.App.3d 57, 221 Cal.Rptr. 353 (1985) for the proposition that a broker may be an agent of both the lender and the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

borrower. *Montoya* appears to address only the relationship between a broker (and the broker's employee) and the borrowers. *Id.* at 64.However, the parties have cited no authority indicating that a broker may never be the agent of a lender. The complaint contains a boilerplate allegation of agency between and among all defendants, which is incorporated into the claim for professional negligence. (Complaint ¶¶ 27, 114). Although Decision One asserts that the defendant mortgage broker was not its agent, it acknowledges that plaintiffs' agency allegation survives dismissal at the pleading stage. *See Greenberg v. Sala,* 822 F.2d 882, 886 (9th Cir.1987) ("[A]s a matter of law, allegations of agency, vicarious liability, and/or *respondeat superior* are not required. A person legally responsible for an act may be alleged to have committed it without going into the theories which support that ultimate fact.").

Accordingly, Decision One's motion to dismiss plaintiffs' professional negligence claim is granted, but only insofar as it alleges direct liability by Decision One. The motion to dismiss is denied to the extent that plaintiffs' negligence claim is based upon the secondary liability of Decision One.

### 2. *Eighth Claim for Relief: Violation of California Civil Code § 1632*

California Civil Code section 1632 provides, in relevant part:

Any person engaged in a trade or business who negotiates primarily in Spanish, Chinese, Tagalog, Vietnamese, or Korean, orally or in writing, in the course of entering into any of the following, shall deliver to the other party to the contract or agreement and prior to the execution thereof, a translation of the contract or agreement in the language in which the contract or agreement was negotiated, which includes a translation of every term and condition in that contract or agreement.

CAL. CIV.CODE § 1632(b). The statute was enacted "to increase consumer information and pro-

tections for the state's sizeable and growing Spanish-speaking population."*Id.,* § 1632(a)(1).

Plaintiffs assert their claim for violation of California Civil Code section 1632 against nearly all defendants, including Decision One. They allege that "[d]efendants failed to provide any loan documentation in the Spanish language despite the fact that the loans were negotiated in Spanish."(Complaint, ¶ 124). Further, they allege that "[p]ursuant to subdivision (k) of California Civil Code ¨§ 1632, defendants must allow plaintiffs to rescind such loans."(*Id.* ¶ 125).

**\*5** Decision One argues that this claim must be dismissed because California Civil Code section 1632(b)(2) specifically excludes loans secured by real property, like the type of loan at issue in the instant case. Plaintiffs counter that Decision One overlooks the exception stated in section 1632(b)(4). Indeed, section 1632(b)(4) states that notwithstanding the exclusion of loans secured by real property, the statute applies to "a loan or extension of credit for use primarily for personal, family or household purposes where the loan or extension of credit is subject to the provision of Article 7 (commencing with Section 10240) of Chapter 3 of Part I of Division 4 of the Business and Professions Code...."CAL. CIV.CODE § 1632(b)(4). The cited section of the California Business and Professions Code, in turn, applies to certain loans secured by real property which are negotiated by a real estate broker. *See*CAL. BUS. & PROF.CODE, § 10240. In the instant case, the complaint alleges sufficient facts showing that the loan at issue falls within California Civil Code section 1632, by virtue of the exception stated in section 1632(b)(4).

Decision One maintains that section 1632 is inapplicable because it was not acting as a real estate broker. However, as discussed above, the court has concluded that plaintiffs have, under liberal federal pleading standards, stated a claim against Decision One under a theory of secondary liability. Plaintiffs' agency allegation is incorporated into their claim for violation of California Civil Code section 1632.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2067072 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

(Complaint, ¶ 123). Accordingly, Decision One's motion to dismiss plaintiffs' claim under California Civil Code section 1632 is granted, but only insofar as it alleges direct liability by Decision One. The motion to dismiss is denied to the extent that plaintiffs' claim is based upon the secondary liability of Decision One.

### IV. ORDER

Based on the foregoing, IT IS ORDERED THAT:

1. Decision One's "Motion to Strike Portions of the Complaint" is GRANTED as unopposed. The following portions of the complaint are stricken:
   a. Page 2, ¶ 1: "on behalf of the general public";
   b. Page 17, ¶ 103: "and the general public" and "and the general public";
   c. Page 17, ¶ 104: "and the general public"; and
   D. Page 17: ¶ 106 in its entirety.

2. Decision One's motion to dismiss plaintiffs' seventh claim and eighth claims for relief is GRANTED IN PART AND DENIED IN PART. Decision One's motion as to plaintiffs' claims for professional negligence and violation of California Civil Code section 1632 is GRANTED insofar as these claims allege direct liability as to Decision One. The motion to dismiss is otherwise DENIED to the extent that these claims are based upon secondary liability of Decision One.

N.D.Cal.,2006.
Ruiz v. Decision One Mortg. Co., LLC
Not Reported in F.Supp.2d, 2006 WL 2067072 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.